In re **KANSAS CITY JOURNAL–POST CO.**

No. 17236.

District Court, W. D. Missouri, W. D.

Sept. 18, 1943.

Rehearing Denied Oct. 5, 1943.

Samuel W. Sawyer and A. J. Granoff, both of Kansas City, Mo., for W. B. Bostian, trustee in bankruptcy.

R. B. Caldwell and John Oliver, both of Kansas City, Mo., for Morris Schapiro.

James A. Reed and Robert J. Ingraham, both of Kansas City, Mo., and Hugh H. Obear, of Washington, D. C., for Harry Newman.

OTIS, District Judge.

I. Order on Schapiro's Petition to Reclaim.

Morris Schapiro owned bonds issued by Kansas City Journal-Post Company of the face value of $500,000 secured by a deed of trust on the properties of the company. On a final refusal by the company to pay, he foreclosed the deed of trust and bought in the properties. The prime question now presented is: In the Journal-Post bankruptcy proceeding is Schapiro's claim to be subordinated to the claims of unsecured

creditors, claims which not only were not secured but which arose after the execution of the deed of trust? The learned referee did subordinate his claim. The matter is here on Schapiro's petition to review.

The referee subordinated the claim on the theory that the rules of law declared in Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 245, 84 L.Ed. 281, are applicable to the facts here. It was held in that case that in bankruptcy the claim of a dominant stockholder of a corporation against the assets of the corporation must be carefully scrutinized, since the dominant stockholder is a fiduciary as to minority stockholders and creditors. His "dealings with the corporation are subjected to rigorous scrutiny and where any of [his] contracts or engagements with the corporation is challenged the burden is on the * * * stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein." The referee believed that Schapiro was a dominant stockholder and that, in the acquisition of his claim, he had so violated, as against creditors, his fiduciary obligation as that in equity his claim should be subordinated. Since learned counsel for Schapiro do not challenge the law as declared in the case cited, the questions for decision are questions of fact. Was Schapiro a dominant stockholder? If he was, did he violate any fiduciary obligation to creditors—and what creditors—in any transaction with the corporation which transaction resulted in his claim? If he did, how did he violate his obligation?

*A Preview*

The answers to the questions must be looked for in the specific findings of fact set out hereinafter. Before they are set out, due consideration for the great labor and fine thought the referee has given the case suggests a brief description of the situation as it appeared to him. The record presented to him the picture of a company publishing a metropolitan newspaper (Kansas City Journal-Post) which suddenly collapsed and was thrown into bankruptcy. For a long period before the catastrophe the late Henry L. Doherty owned all the common stock of the company, all the bonds (for which he had put $500,000 into the company) and the company's promissory notes in an amount of $356,100 (largely amounts advanced to the company by Doherty and Doherty corporations). Indeed Doherty owned everything (for we shall not distinguish Doherty and his companies), including all but one of the sizable obligations of the company. He did not own the account of the International Paper Company in the principal sum of $240,-663.98. Originally Doherty had acquired an interest (later to grow into full ownership) in the newspaper that he might have a weapon to use in battles in which his various companies were involved.

Doherty died in 1939. General Properties, Inc. (also a Doherty Company), took over his interests in the Journal-Post and all his estate. It too desired that publication of the paper should be continued. The Doherty companies still needed a journalistic champion. It desired also, however, to dispose of its interests in the paper, all its interests, of whatever character. But, to make it more likely that the paper would continue to be published, it imposed as a condition precedent on any purchaser that he should put in the treasury of the company $100,000 of additional working capital. While General Properties, Inc., did not own the account of the International Paper Company, it believed—and had some reason to believe—it could obtain an assignment of that account (it was valueless if the bonded indebtedness was valid and superior and none had questioned that) and could throw that in with all else.

Now appeared one Newman on the scene in the role of prospective purchaser. He claimed to represent an unidentified principal. As a matter of fact, he then had no principal. And no money. If he succeeded in securing an offer to sell he hoped to find a "principal" who would put up the money. He did secure an offer to sell with the condition precedent we have mentioned attached to it. The understanding was that the International Paper Company's account would be included in the transfer of properties. After Newman secured the offer he set about finding some man who had money. He thought of Joseph Davies and hinted that Davies was his man. But Davies did not rise to the lure, if it was dangled before him. His son-in-law, however, a United States Senator from Maryland, introduced Newman to Schapiro. Schapiro must have been impressed with such an introduction. (Indeed, some of counsel speak the title "United States Senator" as if it were synonymous with "Mahatma.") Schapiro moved from ob-

1012

scurity to the stage although scarcely out of the shadow of the wings. And with him came Rosen, his lawyer. Being a lawyer, Rosen did not so diligently as Schapiro shun the limelight.

The referee viewed Newman, Schapiro and Rosen as a single personality. Whether they are thus to be coalesced is one of the controverted issues. For the purpose of this preview we speak of Mr. X (Whether X was Newman or Schapiro or Rosen or all three we shall leave presently unanswered). It is certain that Mr. X paid $100,000 to General Properties, Inc., and agreed to put an additional $100,000 of working capital into the Journal-Post. It is certain that Mr. X expected to receive —but did not insist on receiving—the account of the International Paper Company without any additional outlay (unless, perhaps the assumption of some kind of a contractual obligation to buy paper in the future from that company). It is certain that Mr. X did go through the form of paying the Journal-Post as additional working capital $100,000. But, having paid it in, he drew it out and put it in his pocket. The referee thought that was a gross fraud —and so we think. The referee believed that that fraud was contemplated from the beginning. The referee believed that by reason of the fraud any claim of X should be subordinated to the claims of other creditors.

*Findings of Fact*

 *Preliminary Note.* In making findings of fact we have in mind the rule that facts found by the referee generally are to be accepted, if supported by any evidence. The referee saw the witnesses. He was in a position of great advantage to judge the credibility of witnesses. That, of course, is true in any case tried to a referee. The particular referee who presided in this case not only is learned in the law of bankruptcy, but is an outstanding lawyer—a former president of the Lawyers Association of Kansas City— a man highly esteemed by judges and lawyers for his rock-like integrity, his keen intelligence and his judicial fairness. (Happily the lawyers who appeared before him in this matter and who have appeared before us are among the most highly honored and respected members of the Missouri bar.) We have accepted the referee's finding as to every material fact issue where that finding is supported by any evidence, although, of course, we have read the whole record. We have had in mind also the rule that the referee is not bound to accept any particular testimony even if uncontradicted. But that rule must not be distorted. While, for example, a referee need not find that a given animal is a "bay horse" although witness A so testified and none contradicted him, he cannot find that the animal is a "white mule" without some supporting testimony. And now our Findings.

1. When Henry L. Doherty died in 1939, he owned all the common stock of the Kansas City Journal-Post Company. He owned also the bonds that company had issued August 1, 1931, in the face amount of $500,000. For them he had paid $500,000. They were secured by a deed of trust on the Journal-Post properties. The deed of trust was duly recorded. Doherty owned also various notes of the Journal-Post Company in a principal amount of $356,100.

2. On the death of Doherty all his Journal-Post properties passed to General Properties, Inc. On September 24, 1941, General Properties, Inc., offered to sell what had been Doherty's Journal-Post properties to Harry Newman for $100,000 upon the condition that he increase the working capital of the Journal-Post in the amount of $100,000.

3. Newman accepted the offer of General Properties, Inc. upon four conditions, one of which was that General Properties, Inc., should deliver to him an assignment of the claim of International Paper Company in the principal amount of $240,663.98.

4. October 18, 1941, Morris Schapiro entered into an agreement with Newman taking over Newman's option to buy upon the same condition precedent and subject to the same conditions. The $200,000 required was to be advanced by Schapiro. Schapiro intended at some time to turn over the stock he acquired to Newman and to keep for himself the bonds and the deed of trust securing them and the notes.

5. The condition that the claim of International Paper Company should be assigned was waived by Schapiro and Newman.

6. Schapiro, having acquired all the stock, turned that stock over to Newman and with it the control of the Kansas City Journal-Post, including the control of the $100,000 which had been paid into the working capital by Schapiro under the contract.

7. Newman and General Properties, Inc., when the offer originally made to Newman was accepted by him on conditions, expected, and Schapiro when he advanced $200,000, expected that the claim of International Paper Company would be assigned to the purchaser from General Properties, Inc. They still hoped for that assignment when the contract was closed but closed the contract notwithstanding. Had that claim been so assigned all the stock and substantially all the obligations of the Journal-Post Company would have been in the control of Newman and Schapiro. Contemplating such a development, Schapiro and Newman contemplated the possibility of a sale of all that had been purchased at a profit and some division of that profit between them. If the prospect of a sale of all which was purchased should be dulled or blighted, either by a failure of the newspaper to prosper under its new management or by some untoward event or development then they contemplated that Schapiro would profit by the sale of assets covered by the deed of trust and that Newman would profit in any way he could. There was much to be hoped for and little chance of loss. (This particular finding is, in part, a reasonable inference from facts and circumstances in evidence).

8. Untoward events happened. The expected assignment of the claim of the International Paper Company did not come through. On the contrary, that company began to move to enforce its claim. (On February 20, 1942, it filed an involuntary petition in bankruptcy.) Certain expected subsidies were withheld. Newman decamped with $99,900 of the working capital (an untoward event but not unexpected by Newman who had planned it).

9. Schapiro began foreclosure by publishing notice thereof February 26, 1942. The property was sold to Schapiro March 23, 1942, for $250,000 paid by a credit in that amount. Subsequently Schapiro released the property to the trustee "without prejudice" to his right to reclaim.

10. Every creditor had full knowledge that the bonds, secured by deed of trust, were outstanding and unpaid. No owner of the bonds by any act ever had indicated to any person any intention not to collect on them or to subordinate them to the claim of any other creditor. No creditor extended credit on the theory that payment of the bonds would not be enforced.

11. When Schapiro acquired the bonds the Kansas City Journal-Post Company was insolvent.

### Application of Law to Facts

With the facts established, we return to Pepper v. Litton and its rules of law. That case, as we have noted, held that in bankruptcy the claim of a dominant stockholder must be carefully scrutinized, since he is a fiduciary as to minority stockholders and creditors. His "dealings with the corporation" must be "subjected to rigorous scrutiny." He must prove "the good faith" and "inherent fairness" of his "contracts or engagements with the corporation." But does the law thus declared apply to our facts?

Schapiro became the dominant, indeed the sole, stockholder of the Journal-Post Company. He acquired the stock and he acquired the bonds in the same instant and by the same transaction. He was a stranger to the company when he acquired stock and bonds. As a stranger to the company he certainly had no fiduciary obligation either to the company, its stockholders or its creditors. He could not violate—at the time he acquired the bonds—a fiduciary obligation which did not then exist.

In the doctrine of Pepper v. Litton it is not every claim even of a dominant stockholder that is to be scrutinized and that may be set aside or subordinated. In that case Litton's claims for salary from his corporation were scrutinized. But if Litton had bought for value from John Doe a note secured by a chattel mortgage on an automobile belonging to his corporation, would his claim based on that note have been scrutinized and subordinated? Not under the doctrine of Pepper v. Litton. It is dealings of the dominant stockholder "with the corporation," it is "contracts or engagements with the corporation" that are to be scrutinized.[1]

Schapiro, when he acquired the bonds,

[1] We have seen what are the holding and reasoning of Pepper v. Litton. In this note we review most of the cases cited in the opinion in that case and most of the supporting cases cited by counsel in this case in their briefs, that for the purpose of more clearly presenting the doctrine of Pepper v. Litton by illustrations of it. We have found no case differing from those reviewed. In Geddes v. Anaconda Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425 cited

1014

was under no fiduciary obligation to any creditor. If so, what was that obligation? When he bought the bonds he bought the right to foreclose the deed of trust and every creditor knew the lawful owner of the bonds had that right and would exercise it when he chose, after default. Certainly there could be no breach of any fiduciary obligation—assuming the existence of any—in the foreclosure.

■ If it be assumed arguendo that it was Schapiro who ran away with the working capital in the amount of almost $100,-000, was that a breach of a fiduciary obligation? To whom? The stockholders? But Schapiro owned the stock. The creditors? Yes, especially if any extended credit because of that addition to the working capital. None has testified he did. In any

event the breach of a fiduciary obligation does not have a retroactive effect so as to destroy or militate against a perfectly lawful claim based on a contract made between the holder of the bonds of a corporation and the purchaser of those bonds. If Schapiro's claim bottomed on the bonds had some causal connection with the looting, that claim well might be subordinated or stricken down entirely. But equity is not so inequitable as to cancel A's lawful contract with B and destroy its fruits because A has robbed C's hen roost.

■ It seems clear to us that both referee and trustee's counsel have overlooked a fact which Pepper v. Litton makes essential to the application of its doctrine. If the claim of a dominant stockholder arises from some transaction with the corpora-

in the Pepper case, it was ruled that equity would set aside a sale of the properties of a corporation to another corporation in the suit of minority stockholders when both corporations were dominated by the same individual, a director of both. The fiduciary obligation of a dominant director to minority stockholders with respect to transactions with the corporation was the ground given for the conclusion reached. In Taylor v. Standard Gas Co., 306 U.S. 307, 618, 59 S.Ct. 543, 83 L.Ed. 669, cited in the Pepper case, it was held that in a corporation-reorganization proceeding the claims of the owner of all the common stock for money loaned the corporation whose affairs it had mismanaged should be subordinated to the claims of preferred stockholders who had no share in management. In Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 23 L.Ed. 328, cited in the Pepper case, it was held that the lending of money by a director to his corporation was a transaction that would be scrutinized in equity. In Southern Pacific Co. v. Bogart, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099, cited in the Pepper case, it was held that when a majority stockholder deals with the property of a corporation so as to profit its fiduciary obligation requires it to account to minority stockholders. In Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853, cited in the Pepper case, in a footnote, it was held that a dominant stockholder owed such a fiduciary obligation to minority stockholders that if he concealed from a minority stockholder his knowledge touching the value of lands held by the corporation and then bought the stock of the minority stockholder the sale should be set aside. In Manning v. Campbell, 264 Mass. 386,

162 N.E. 770, cited in the Pepper case, in a footnote, it was held a trustee in bankruptcy might sue directors of the bankrupt corporation for mismanagement of the affairs of the corporation in violation of their fiduciary obligation. To the same effect is Stephan v. Collateral Corp., 256 N.Y. 418, 176 N.E. 824, cited in the Pepper case in a footnote. In Dean et al. v. Shingle et al., 198 Cal. 652, 246 P. 1049, 46 A.L.R. 1156, cited in the Pepper case, in a footnote, it is held that if a corporation official sells his own property to a corporation, without disclosing his ownership, the transaction is voidable at the election of the corporation. Wyman v. Bowman, 8 Cir., 127 F. 257, cited in the Pepper case, in a footnote, had to do with loans of money by directors to a corporation and discusses their fiduciary obligation in such a transaction.

While learned counsel for the trustee take their stand on Pepper v. Litton as if it were The Rock of Ages, they cite certain supporting cases. In Goldie v. Cox, 8 Cir., 130 F.2d 695, the claim of the president of a bankrupt corporation for alleged advancements to the corporation was subordinated. Boyum v. Johnson, 8 Cir., 127 F.2d 491, was a case in which the claim of a dominant stockholder was for salary for services to the bankrupt corporation and for advances to the corporation. Lebold v. Inland Steel Company, 7 Cir., 125 F.2d 369, concerned a transaction by a dominant stockholder with his corporation concerning the property of the corporation. Barlow v. Budge, 8 Cir., 127 F.2d 440, was a case in which the claim of a dominant officer and stockholder of the bankrupt corporation was bottomed on advances made by him to the corporation.

tion, it may be subordinated, if some inequity on his part is shown. And we have been constrained carefully to examine once more the referee's memorandum and the briefs of trustee's counsel to find what they have said about the presence in this record of that essential fact.

The referee made findings of fact (somewhat intermingled with argument and ratiocination and conclusions of law and not precisely in that form which may be called orthodox). In his findings there is not the remotest suggestion (had there been, there is no support for it in the record) that Schapiro's claim was bottomed on any transaction by or for him as dominant stockholder with the corporation. His claim is bottomed on the bonds secured by a deed of trust and his purchase at foreclosure sale. He did not buy the bonds from the corporation and when he bought them he was not a stockholder.

And we have searched in vain in the several briefs of trustee's counsel (those filed with the referee and those filed with us) for any suggestion that Schapiro's claim is based on any transaction with the corporation or when he was a stockholder. In one brief an earnest argument is made that if Doherty was the claimant on the bonds his claim should be subordinated. That argument, we think, is unsound, but, if it were sound, Doherty's transaction acquiring the bonds was with the corporation when he was the dominant stockholder. It is admitted in the same brief in so many words that Schapiro "simultaneously" acquired the bonds and stock. So it is admitted that Schapiro's claim did not arise from any transaction by him as a stockholder with the corporation.

Nowhere is it even asserted by counsel (unless the assertion is afterward withdrawn) that Schapiro, as a stockholder, acquired the bonds, on which his claim is based, in any transaction with the corporation in which Schapiro could possibly have been under any fiduciary obligation. Instead of pointing to the facts which Pepper v. Litton declares essential, counsel say that Schapiro bought the bonds after maturity and so was "charged with knowledge of all the facts concerning them" and "took them subject to all defenses." But counsel do not pretend to argue—it would be absurd to argue—that the fact they mention transmutes Schapiro (not a stockholder), dealing with General Properties, Inc., (not the Journal-Post Company), into a dominant stockholder dealing with that company. And counsel say he bought the bonds at a bargain and intended to make a profit. But do such facts damn any man or the claim of any man? Are they the essential facts Pepper v. Litton call for? Pages are devoted to showing that, after Schapiro acquired the bonds and became a stockholder, he engaged in wrongdoing against the company and its creditors. Let that be admitted arguendo. It is no showing of the facts declared essential in Pepper v. Litton.

But, it is argued in another brief (in this case briefs fell like autumn leaves) that when Schapiro acquired bonds and stock (of course, then he had no fiduciary obligation) he intended and already had conspired with Newman that, at a later time, when Schapiro would have become dominant stockholder he would violate his then fiduciary obligation by joining with Newman in looting the treasury of the company. But none of that suggests the essential facts required by Pepper v. Litton. The argument, however, does suggest a line of thought independent of the particular query we have been pursuing.

■ If the facts alleged in the argument are conceded arguendo, do they have any significance? Suppose we forget Pepper v. Litton and its limited applicability and remember only that a court of bankruptcy is a court of equity governed by the general principles of equity. Is there any principle of equity that would justify subordinating Schapiro's lawful and valid claim, acquired when he was not a stockholder and not in any transaction with the company, a claim originating in bonds secured by a deed of trust of which every one had notice, is there any principle of equity which requires subordinating that claim, because of some secret thought which was in Schapiro's mind when he bought the bonds or some fraudulent plan he and another had then in mind? We have reviewed the maxims. Which one is in point? Is it this (we can think of no other even to discuss): "He who comes into equity must come with clean hands?" It is this maxim, of course, which is embodied in the doctrine of Pepper v. Litton. He who comes into a court of bankruptcy (into equity) to enforce a claim must not come to enforce a claim at the expense of creditors which he has acquired in breach of a fiduciary obligation he owed to creditors (his hands are not clean). But Schapiro did not come into equity in any

true sense. He was dragged in. He foreclosed his deed of trust out of court and bought the property sold under it. The trustee took the property, Schapiro consenting "without prejudice." Then Schapiro sought to reclaim that property. He asked no equitable relief against any. Moreover, "The misconduct which falls within the clean hands maxim must relate directly to the transaction concerning which complaint is made or the subject matter in litigation." 30 C.J.S., Equity, § 98, p. 491. The misconduct charged against Schapiro is entirely unrelated to the transaction in which he acquired the bonds and has no connection whatever with that transaction.

*Minor Issues*

There remain for brief consideration certain minor issues which have been more or less in controversy and may, to some extent, still be in controversy. In the evolution of this proceeding some of the contentions originally made by counsel for the trustee have been abandoned or almost abandoned. And some of the contentions made from the beginning by Schapiro's counsel, although not abandoned, need not be considered in extenso. Either they must be resolved against Schapiro, or they are immaterial in the view we have taken of the principal controversy.

It has been forcibly argued by Schapiro's counsel that Schapiro was never a stockholder, therefore never a dominant stockholder, and that hence Pepper v. Litton has no application. But the referee found as a fact that he was a dominant stockholder and so we have found. It is a conclusion required by the facts and circumstances in evidence although contrary to certain—perhaps to all—direct testimony.

In the beginning it was forcibly argued by trustee's counsel that the foreclosure sale was void, since the proceeding to foreclose began after the filing of the involuntary petition in bankruptcy. But counsel rightfully abandoned that position and maintained at the last only that it was voidable, if the principles of Pepper v. Litton applied to the facts. Counsel for Schapiro countered the contention of trustee's counsel, as first urged, by asserting that the involuntary petition in bankruptcy was void (because falsely asserting the Journal-Post Company had less than twelve creditors when it had more than twelve), but we think it unnecessary to consider that (although our tentative view is that the validity of the involuntary petition cannot be thus collaterally attacked). Our conclusion that Schapiro was guilty of no inequity, in connection with the acquisition of the bonds and the claim based upon them, and that he did not acquire the bonds in any transaction between stockholder and corporation, makes inapplicable Pepper v. Litton, whether the involuntary petition was void or valid and whether the proceeding to foreclose was commenced before or after the filing of a valid petition in bankruptcy.

Two contentions of trustee's counsel have not entirely been abandoned, although the force with which they have been argued (they have not at all been urged upon us, they were urged upon the referee) has grown weaker as the argument has proceeded until, at the end of the argument, they are scarcely able to stand on their own feet. In neither of these contentions, apparently, did the learned referee find any merit. One is that the description of the property conveyed in the deed of trust which secured the bonds acquired by Schapiro was not as definite as the law requires and that, therefore, the deed of trust is void. The deed purports to cover "all property of every name and nature, real, personal or mixed, wheresoever situated. * * *" The asserted indefiniteness is in the phrase "wheresoever situated." But when the whole description is read no indefiniteness appears. The record does not show—and no contention is made—that there ever was any difficulty in identifying what was intended to be covered.

The second of these two contentions is bottomed on Sec. 3100, R.S.Mo. 1929, now Sec. 3490, R.S.Mo.1939, Mo.R. S.A. The cited statute imposes a five years' limitation on chattel mortgaged "filed" (as required by Sec. 3486, R.S.Mo.1939, Mo.R. S.A.). But trustee's counsel concedes that the deed of trust in this proceeding was not so "filed" and at last concedes that no decided case lends support to the argument. Clearly it has no merit.

*Conclusion of Law*

Upon the facts found, the petition of Morris Schapiro to reclaim the property in the possession of the trustee and purchased by Schapiro at the foreclosure sale of March 23, 1942, should be granted and orders made by the referee inconsistent with granting Schapiro's petition to reclaim should be set aside.

### Order

The petition of Morris Schapiro, filed May 17, 1943, to review the order of the

referee filed April 5, 1943, denying Schapiro's petition to reclaim and containing certain other provisions, coming on to be heard upon the referee's certificate filed May 27, 1943;

And the Court having considered the certificate of the referee and all documents sent up with the certificate or incorporated therein by reference, including the briefs of counsel filed with the referee, and the transcript of testimony taken before the referee, and having also considered the briefs and oral argument of counsel presented to the Court in connection with the submission of the petition to review;

And the Court having made findings of fact and announced a conclusion of law and having filed a memorandum opinion and being fully advised in the premises:

It is by the Court ordered, adjudged and decreed:

(1) That the order of the referee filed April 5, 1943, as to Paragraphs 1, 2, 3, 4, 5 and 6 thereof, be and the same is hereby vacated and set aside;

(2) That the petition of Morris Schapiro to reclaim, filed June 23, 1942, be and the same is hereby sustained and the trustee is directed to turn over to Schapiro all property described in the petition to reclaim and of which the trustee took possession April 15, 1942.

## II. Order on Schapiro to Turn Over $24,000.

The question presented by this petition to review is whether the referee had summary jurisdiction to make a turn over order on Morris Schapiro requiring him to deliver to the trustee the proceeds of a $24,000 check he had received via one Rosen from one Harry Newman. The trustee's petition for a summary order on Schapiro was filed May 27, 1942, and the order to show cause was made on that day. Schapiro's response was filed June 23, 1942. The response denied the essential allegations of the petition, except that it admitted the possession of the $24,000 and prayed dismissal for want of summary jurisdiction.

The referee overruled the plea to the jurisdiction on January 19, 1943. He said he did so on the authority of Rabinovitz v. Oughten, 3 Cir., 92 F.2d 297, and Peck v. Howard, 9 Cir., 130 F.2d 1001. The first of these cases holds that a court of bankruptcy "has jurisdiction to inquire into the claim [a claim asserted to be adverse] for the purpose of ascertaining whether the

summary remedy is an appropriate one. * * * It may disregard the assertion that the claim is adverse, if on the undisputed facts it appears to be merely colorable." The second case holds that upon the assertion of an adverse claim "the court may enter upon a preliminary inquiry to determine whether the adverse claim is real and substantial or merely colorable, and if found to be merely colorable, the court may then proceed to adjudicate the merits summarily; * * *."

Schapiro's response asserted an adverse claim. The referee held that that fact alone did not prevent the exercise of summary jurisdiction, provided a preliminary inquiry showed the claim merely colorable. The referee ruled that Schapiro's claim was merely colorable. But was there a preliminary inquiry within the meaning of the cases?

1. We are constrained to believe that there was such a preliminary inquiry as the law requires, although it certainly was conducted in an unorthodox manner. The referee asserted that he had taken into consideration all of the evidence that he had heard in all of the proceedings prior to the date of his ruling on the plea to the jurisdiction, 2,000 pages of evidence and accompanying exhibits. But no part of that evidence seems to have been taken in any formal preliminary inquiry. Generally we think that the preliminary inquiry required by law must be an inquiry known to the interested parties to be such and to have the purpose of determining whether an adverse claim is colorable.

While the referee, without any proper preliminary inquiry, ruled that the plea to the jurisdiction should be overruled, contemporaneously with that ruling the whole transcript of the testimony, being the very testimony to which the referee had referred, was offered by the trustee. Schapiro objected to the offer only on the ground that it was untimely, that is, that it had been made after the referee had ruled on the plea to jurisdiction. That objection the referee overruled, saying: "The objection will be overruled for the reason in arriving at the decision I took into consideration the testimony which is being offered."

While the referee was in error in regarding the proceedings which had been had before him as such a preliminary inquiry as the law requires before it can be held that an adverse claim is only colorable, that error was cured, in our judg-

**1018**

ment, by the offer in evidence of the transcript of the proceedings without any objection to the relevancy of the evidence offered. When that evidence was offered (and no other evidence was offered) on the issue of whether Schapiro's claim was merely colorable, there was a preliminary inquiry.

█ 2. But did the referee, at the preliminary inquiry, rightly reach a conclusion that he had jurisdiction? We think he did not rightly reach that conclusion. He was led to an erroneous conclusion by an entirely unsound theory of law. We think it was unsound. His theory was that in determining, in a preliminary inquiry, whether an adverse claim is merely colorable the referee may reject testimony which he believes to be false. We think he cannot do that. Our views on that subject are set out in our memorandum on Newman's petition to review.

The trustee must bring a plenary suit against Schapiro.

### Order.

1. The petition of Morris Schapiro for a review of the referee's order overruling Schapiro's plea to the jurisdiction of the referee to make an order on Schapiro to show cause why he should not be ordered to turn over to the trustee the sum of $24,000 having been duly considered by the Court, together with the certificate and accompanying exhibits, and the Court being fully advised in the premises, is by the Court sustained. The order of the referee is set aside and will be for naught held.

2. Schapiro's motion for affirmative relief and his objections to the referee's certificate are overruled.

So ordered.

### III. Order on Newman to Turn Over $75,900.

The learned referee in a summary proceeding ordered Harry Newman to turn over to the trustee $75,900. Newman has petitioned for a review of that order. The first point in the petition is that the referee had no jurisdiction to proceed summarily. We shall first consider and pass upon that point.

Resolving, for the time being only, doubts, where there may be said to be doubts, against Newman, we shall consider the following as facts:

1. Kansas City Journal-Post Company was adjudicated a bankrupt April 15, 1942, and a trustee was thereafter regularly appointed.

2. May 29, 1942, the trustee petitioned for an order requiring Newman to turn over $75,000 (by amendment $75,900 was sought) alleged to be the property of the bankrupt and to be withheld by Newman without color of title and without adverse claim. On the same day an order on Newman to show cause was made.

3. Newman's answer and response, filed June 25, 1942, denied jurisdiction in a summary proceeding, denied generally the allegations of the trustee's petition (except that Newman had withdrawn, long before bankruptcy, $75,900 from a bank account in the name of Kansas City Journal-Post Company) alleged in adverse claim that the money withdrawn was and always had been Newman's, alleging also facts claimed to support that conclusion.

4. No formal preliminary inquiry ever was held by the referee to determine whether he had jurisdiction to proceed summarily. Neither the referee's memorandum nor the briefs of trustee's counsel make any reference to any preliminary inquiry.

5. The referee found that the testimony of Newman and supporting testimony was false and that his adverse claim was merely colorable. And the referee found that the money withdrawn by Newman was withdrawn by him in fraud of his company and its creditors.

### The Erroneous Theory

█ It would be idle to contend—and no one has contended—that Newman's answer and response did not set up an adverse claim. The law is perfectly clear that where an adverse claim is made to property charged, as here, to be in the possession of another than the bankrupt, which property the trustee demands, as here, that property must be recovered in a plenary proceeding unless, in a preliminary inquiry, the referee determines that the adverse claim is merely colorable. Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897.

We cannot find that there was any preliminary hearing in this matter. In connection with another petition to review we have learned that the referee conceived that he might ex post facto consider at a preliminary hearing evidence in the record introduced in other connections. But setting to one side whether that can be

done, it is perfectly obvious, from the referee's memorandum and from the briefs of trustee's counsel, that it is the referee's theory and that it is counsel's theory that in a preliminary hearing to determine whether there is jurisdiction to proceed summarily the referee may reject testimony as false and determine from what he believes is truthful testimony whether an adverse claim is merely colorable. Such a theory, in our judgment, is untenable.

■ Of course, in a summary proceeding, where the referee is the trier of facts, he, like any other trier of facts, may reject testimony he believes false. He cannot do that in a preliminary inquiry. There the issue is, is the claim merely colorable, that is, accepting the facts pleaded and sworn to, is there any real adverse claim in law? The referee "may disregard the assertion that the claim is adverse, if on the undisputed facts it appears to be merely colorable." May v. Henderson, 268 U.S. 111, 116, 45 S.Ct. 456, 459, 69 L.Ed. 870. The situation is comparable to that in which any trial judge is placed when a demurrer to the evidence is offered at the close of plaintiff's case. For the purpose of ruling on that demurrer the trial judge must accept as true the testimony of plaintiff's witnesses. The right of a litigant to a jury trial (and the right of an adverse claimant to a plenary proceeding) does not depend on whether the judge (or the referee) believes his witnesses. If it· were otherwise the right to a plenary trial, as distinguished from a summary proceeding, would disappear in any case in which the referee would say: "I disbelieved the claimant and his witnesses." In re Western Rope & Mfg. Co., 8 Cir., 298 F. 926.

■ The trustee in this case should resort to a plenary proceeding. With such evidence to support his cause as was heard and considered by the referee, he might well prevail in that proceeding.

## Order.

The petition to review the referee's order requiring Newman to turn over to the trustee $75,900, having been duly considered by the Court, together with the .certificate of the referee and all documents, transcripts and records sent up therewith, and the argument of counsel, and the Court being fully advised in the premises, it is by the Court ordered, adjudged and decreed that the prayer of the petition be sustained, for want of jurisdiction in the referee to make the order in a summary proceeding, and that

The order of the referee be set aside and for naught held, and that all orders incidental to that order be also set aside and for naught held.

So ordered.

## IV. Order Directing Trustee to Sell Free and Clear.

■ The referee made an order, filed April 5, 1943, that the property of Kansas City Journal-Post Company, in the possession of the trustee, be sold free and clear of liens and that all liens be transferred to the proceeds of the sale. Morris Schapiro has petitioned for a review of that order.

This memorandum must be read in connection with that filed on Schapiro's petition to review the referee's order denying Schapiro's petition to reclaim and subordinating Schapiro's claim.

The prime justification for the order to sell free and clear of liens were the conclusions of the learned referee that Schapiro's claim should be subordinated to the claims of other creditors and that his asserted lien is invalid. In these respects, as we have endeavored to point out in the memorandum referred to, the referee, we think, was in error. If. so, if Schapiro has a valid claim, secured by a valid deed of trust, a claim that has ripened through a valid foreclosure into ownership, the whole basis for the present order disappears. None will be so bold as to suggest—whatever may expressly have been proved—that the total of Schapiro's secured claim does not greatly exceed any amount that might be realized at a trustee's sale. The trustee and his counsel do not so contend.

We find the facts to be—

(1) Schapiro has a valid claim, secured by a valid deed of trust, against the Kansas City Journal-Post and its property and, through a valid foreclosure of his deed of trust and his purchase, had ownership of and good title to that property when the order now reviewed was made.

(2) The amount of Schapiro's claim exceeds any amount that reasonably might be expected to be realized at a trustee's sale.

We conclude as a matter of law that the trustee should not be ordered to sell free and clear.

### Order.

This matter coming on to be heard on the petition of Morris Schapiro to review the order of the referee, dated April 5, 1943, to sell the property of the Kansas City Journal-Post Company free and clear of liens, and the Court having considered the certificate of the referee and all the documents and records sent up therewith and as a part thereof, and having considered the briefs and oral argument of counsel and having made findings of fact and stated a conclusion of law, accompanied by an explanatory memorandum, and being fully advised in the premises:

It is ordered, adjudged and decreed that the order of the referee of April 5, 1943, be and the same is hereby set aside and for naught held.

Schapiro's motion for affirmative relief and his objections to the referee's certificate are overruled.

### V. Order Directing Rosen to Turn Over KCMO Stock.

The referee made an order requiring Morton H. Rosen to turn over to the trustee a certain 50 shares of the capital stock of the KCMO Broadcasting Company which had been the property of Kansas City Journal-Post Company. In his response to the order to show cause Rosen set up that he held the stock as agent of Morris Schapiro and that Schapiro owned it by purchase at the foreclosure sale under his deed of trust. The referee's view and holding were that the deed of trust was invalid or that, at least, Schapiro's claim, bottomed on his purchase and the deed of trust, should be subordinated. We have reached the conclusion that the referee was here in error. See our memorandum on Schapiro's petition to review. If we were right there the order attacked by the present petition to review should be set aside.

### Order.

1. The order of the referee requiring Morton H. Rosen to turn over to the trustee 50 shares of KCMO stock is set aside and for naught held.

2. Rosen's motion for affirmative relief and objections to the referee's certificate are overruled.

So ordered.

### VI. On Motions for Rehearing

When our several memoranda and orders in this bankruptcy proceeding were filed with the clerk, there was included a special memorandum addressed to counsel against whose clients we had ruled. In it counsel earnestly were asked to move for a rehearing, unless they accepted the results reached by us, and to accompany motions with supporting briefs. Conscious that often we have erred, we were anxious, before our rulings became final, to have the benefit of all the light counsel might give us. We said in one of our memoranda that counsel in this case are among "the most highly honored and respected members of the Missouri bar." Now we individualize that commendation of all counsel by giving it as our testimony, to be incorporated in the books, that Missouri does not have abler and more upright lawyers than trustee's counsel, Samuel W. Sawyer and A. J. Granoff. If from such outstanding advocates we cannot receive more light, it is because there is none. They are partisans, of course. What good lawyer is not a partisan, championing his client's cause with all his zeal, surmounting or circumventing every obstacle with all his skill? It is only from the clash of battling partisans that truth emerges in the courts of justice. Unusual among judges and lawyers is he who thinks an advocate should represent his client's adversary or that an expression of delight in professional ingenuity is a reflection on professional integrity.

The brief supporting the motions for rehearing (counsel have incorporated their arguments for all the motions in a single brief) attacks head-on the legal conclusions embodied in our memoranda. We just were wrong in saying that Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, is not in point (as to Schapiro's right to reclaim). We just were wrong in saying (as to Newman's and like adverse claims) that in a preliminary inquiry to determine whether the referee has summary jurisdiction, the referee cannot reject, as false, testimony supporting the adverse claim and so conclude that the adverse claim is merely colorable and that he has summary jurisdiction. A more clear cut difference of opinion concerning pure questions of law scarcely could be presented.

1. Counsel urge upon us that we have too narrowly interpreted Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. We believed and said that the doctrine of that case was made applicable by the Supreme Court to the claim of a dominant stockholder against a bankrupt corporation, if that claim arose from some transaction

with the corporation and if the stockholder in acquiring the claim had breached the fiduciary obligation a dominant stockholder owes his corporation and its creditors. This, say learned counsel, is a "misconception." Perhaps it is a misconception—our respect for counsel would incline us to think they must be right even when they suggest we are wrong—but another and most painstaking reading of Pepper v. Litton convinces us that, at least in this one instance, we are right.

Certainly none who carefully reads this case from beginning to end (who does not merely lift out of the opinion some single sentence) will have any doubt that its doctrine is restricted to its or to similar facts. (How many hundreds of times has the Supreme Court so restricted the application of its opinions!) The facts were that Litton, a dominant stockholder, had acquired a claim, based on pretended services to a corporation and had acquired that claim in its final form by a course of fraudulent dealing with the corporation. Such a claim, the Supreme Court said, was properly disallowed in a bankruptcy proceeding. Why was it disallowed? Because "the bankruptcy court in passing on allowance of claims sits as a court of equity. Hence [the] rules governing the fiduciary responsibilities of directors and stockholders come into play on allowance of their claims in bankruptcy." Loc. cit. 307 of 308 U.S., loc. cit. 245 of 60 S.Ct., 84 L.Ed. 281. That the claim pressed by Litton was acquired by him, a dominant stockholder, in breach of his fiduciary obligation as such, is the ground given for the decision.

Learned counsel say they will "demonstrate" our narrow interpretation of the case cited by quoting "a few words" from the opinion. And they proceed to quote: "The essence of the test [of good faith] is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside." We are urged then to conclude that if the transaction of a stranger to a corporation, later the bankrupt, with another than the corporation, does not carry "the earmarks of an arm's length bargain," equity will set such claim aside in a bankruptcy proceeding. That seems to be the thought of counsel. But the sentence quoted, which was lifted out of the context, is preceded immediately by a connected sentence making it perfectly clear that "the transaction"

referred to in the sentence quoted is a transaction between a stockholder and his (the later bankrupt) corporation. Other quotations might be as easily disposed of.

In our memorandum we referred to many cases supporting our narrow view of the doctrine of Pepper v. Litton. In the memorandum addressed to counsel we earnestly invited the citation of even one Supreme Court or appellate court decision supporting their broader view. None has been cited in the brief now before us.

Of course, Pepper v. Litton illustrates the general rule that a court of bankruptcy is a court of equity. But a court of equity, as well as a court of law, is bound by age-old principles. It has not arbitrary power. It does not apply one set of rules to the dealer in scrap iron and another to the bishop of the diocese. If the dealer in scrap iron buys a printing press, and has valid, legal title to it, if it is his printing press, no court of equity can take that printing press away from him, arbitrarily and summarily, and give it to another. Not even if the owner, in other connections, has committed all the sins which brought down fire and brimstone on Sodom and Gomorrah.

2. We ruled that if the trustee would recover from Newman and Schapiro he must do so in plenary suits. He sought to do so in summary proceedings. We believed the referee had no jurisdiction to proceed summarily. Our reasons were: 1. There was no preliminary inquiry, in a true sense, to determine whether there was summary jurisdiction. 2. If there can be said to have been a preliminary inquiry, there was no showing in that inquiry that the adverse claims were merely colorable. We said that in a preliminary inquiry to determine whether there is jurisdiction the referee cannot reject testimony supporting an adverse claim because he believes that testimony is false.

Here again the brief of counsel for the trustee supporting trustee's motions for rehearing categorically and courteously denies the views of law we expressed. Counsel do not evade the issue. They make no pretense that Newman and Schapiro did not plead, not by conclusions merely but by facts alleged, an adverse claim. They make no contention that in such a situation the law requires a preliminary inquiry to determine whether there is summary jurisdiction. They seemingly admit there was no formal preliminary inquiry. They con-

tend there was a sufficient preliminary inquiry and they still maintain that in such an inquiry the referee may reject testimony he believes false and, on what remains, determine that an adverse claim is merely colorable. They say: "Our view is exactly contrary to that of the Court. We think that in determining his jurisdiction, the referee has the same right to disbelieve testimony as he does in a trial on the merits." And they say: "It is our view that a preliminary inquiry is an integral but indivisible part of the hearing of the issues raised by a petition for a summary order and response thereto, and that it is not (and cannot) be segregated from the proceeding as a whole."

We should like to see the cases on which counsel rely. We have cited the cases we rely on. We cite them again. In Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 468, 70 L.Ed. 897 (it was preceded and followed by others holding similarly), the Supreme Court said that where there is an assertion of an adverse claim: "[The court], having the power in the first instance to determine whether it has jurisdiction to proceed, * * * may enter upon a preliminary inquiry to determine whether the adverse claim is real and substantial or merely colorable. And if found to be merely colorable the court may then proceed to adjudicate the merits summarily; but if found to be real and substantial it must decline to determine the merits and dismiss the summary proceeding." This language seems to us diametrically to oppose the thesis of counsel as expressed in the last sentence of our next preceding paragraph. The Supreme Court contemplates a situation in which the referee is confronted with the assertion of an adverse claim. The referee must determine whether he "has jurisdiction to proceed." "Proceed" to what? The Supreme Court says, "proceed to adjudicate the merits." He may "enter upon a preliminary inquiry." "Preliminary" to what? Why, to the trial and adjudication of the merits. If the result of the preliminary inquiry is a determination that there is "jurisdiction to proceed" "the court may then proceed to adjudicate the merits summarily." We do not understand the plainest, simplest English, if two hearings are not described, not "integral" one with the other, but separated in time, one following the other, the first a "preliminary inquiry" to determine whether there is jurisdiction and "then," if there is jurisdiction, a hearing on the merits.

It does not follow, of course, that in any given case there will be two hearings. The preliminary inquiry, if it shows no jurisdiction, will be the only hearing. The trustee will be remitted to a plenary suit. Moreover, if the preliminary inquiry shows the adverse claim merely colorable, it may itself furnish a sufficient basis for a summary order unless the parties wish to be heard further. If further evidence is not offered, there is only one hearing in fact, although there are two in theory. The things which it is important to keep in mind are that there must be a preliminary inquiry and that in the preliminary inquiry (as in every hearing known to the law held to determine whether there is jurisdiction to proceed) the facts alleged and proved which show no jurisdiction must be taken as true.

We have cited authorities for our view that in a preliminary inquiry to determine whether there is jurisdiction the referee cannot ignore testimony he thinks false. Counsel say in their brief that in our cited cases (counsel cite no case contra) it is not "expressly" held that the referee may not reject testimony he believes false. Perhaps not "expressly," in the strictest sense. But when Mr. Justice Stone (now the Chief Justice) said in May v. Henderson, 268 U.S. 111, 116, 45 S.Ct. 456, 459, 69 L.Ed. 870, that the determination of jurisdiction in the preliminary inquiry must be on "the undisputed facts," that meant to us that the referee could not ignore testimony which did dispute facts favorable to the referee's jurisdiction. And when Judge Stone (now the Senior Circuit Judge of the 8th Circuit) said in Re Western Rope & Mfg. Co., 298 F. 926, 927, that summary jurisdiction might be used "when, admitting the facts to be as alleged by the claimant, there is, as matter of law, no adverseness in the claim," that was the equivalent of saying that the facts alleged and testified to must be accepted.

The reason for the true rule will appear from a simple illustration. Suppose X Co. is bankrupt. A is trustee. Y has a wheelbarrow. A asserts it belongs to the estate. A show cause order (why he should not turn over) is served on Y. Y files a response claiming the wheelbarrow belongs to him; he bought it at the local store with his money. The referee conducts a preliminary inquiry. Twenty witnesses swear they saw Y steal the wheelbarrow from the bankrupt's warehouse. Y alone testifies in support of his ownership. He

testifies haltingly, with the conduct and demeanor of a petty thief: He admits he once served a term in the penitentiary for perjury. A jury, hearing his story, probably would reject it forthwith. But the referee cannot reject it in his preliminary inquiry. Why? Because of the provisions of a certain document called the Constitution, which guarantees a jury trial in civil as well as criminal cases and that no man's property shall be taken from him except by due process of law. The Constitution protects thieves and liars as well as saints. If we may paraphrase Lord Chatham's famous utterance, not all the referees and district judges can take Y's wheelbarrow from him except by plenary suit. (Why is it that occasionally trustees in bankruptcy shrink from suing in a court of general jurisdiction? Is a court of justice something to be avoided like a plague?)

3. There are certain miscellaneous observations in counsel's brief that deserve attention. One is that we held that there was a preliminary inquiry as to Schapiro's adverse claim but none as to Newman's. But we said there was "no proper preliminary inquiry" even as to Schapiro's claim. We meant to concede, only arguendo, even as to that claim, that there was a preliminary inquiry. Counsel's criticism is just. The word "arguendo" should have been written in. On further reflection we think the requirement of the law—that there must be a preliminary inquiry—cannot be satisfied by a gesture. We did not sufficiently emphasize that point, because it was so clear to us that, conceding there was a preliminary inquiry, it showed that Schapiro's adverse claim was not merely colorable.

· Another observation in the brief must not be passed unnoticed. We set it out verbatim as follows: "We seem to see an inconsistency in the Court's ruling on this matter of Schapiro's withholding of the $24,000 and the Court's ruling on Schapiro's Petition to Reclaim. If Schapiro had no dealings with the corporation (as the Court concluded in the reclamation proceeding) and if a gross fraud had been perpetrated in putting the $100,000 in (his) pocket (as the Court also concluded), then on the face of the record Schapiro has no substantial claim to the $24,000 which was a part of the $100,000. It would seem that the Court reached opposite conclusions on the very same item, having the same record before him."

The fact that able counsel could have written this paragraph proves to us that our memorandum was obscure indeed. We certainly intended to say, not that Schapiro had no dealings with the corporation, but that he had no dealings with the corporation in acquiring his claim to the property which he petitioned to reclaim. And perhaps counsel will point out in what finding of fact—or in what paragraph of our memorandum—we said that Schapiro had put $100,000 of the bankrupt's money "in his pocket." And if we had said it, it certainly would not follow that his claim to $24,000 paid to him by Newman, and which he swore was in repayment of a loan and that he did not know it was a part of the $100,000, was merely "colorable."

Order.

1. The motion of William B. Bostian, Trustee in Bankruptcy, for a new trial and for a rehearing in the matter of the Court's decree and order on petition of Morris Schapiro to review order of referee denying petition to reclaim; 2, the motion of William B. Bostian, Trustee in Bankruptcy, for a new trial and for a rehearing in the matter of the Court's decree and order on petition to review referee's order on Schapiro to show cause why he should not turn over to Trustee $24,000; 3, the motion of William B. Bostian, Trustee in Bankruptcy, for a new trial and for a rehearing in the matter of the Court's decree and order on petition of Harry Newman to review referee's turnover order; 4, the motion of William B. Bostian, Trustee in Bankruptcy, for a new trial and for a rehearing in the matter of the Court's decree and order on petition of Morris Schapiro to review the order of the referee directing the Trustee to sell free and clear of liens; 5, the motion of William B. Bostian for new trial and for a rehearing in the matter of the Court's decree and order on petition of Morten H. Rosen to review referee's order concerning KCMO Stock, are each overruled.

So ordered.