## In re KANSAS CITY JOURNAL–POST CO.

### BOSTIAN v. NEWMAN.

### No. 12806.

Circuit Court of Appeals, Eighth Circuit.

Aug. 11, 1944.

Rehearing Denied Sept. 5, 1944.

820

A. J. Granoff, of Kansas City, Mo. (Samuel W. Sawyer and Claude A. Ferguson, both of Kansas City, Mo., on the brief), for appellant.

Hugh H. Obear, of Washington, D. C. (James A. Reed, Robert J. Ingraham, and Burr S. Stottle, all of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, JOHNSEN, and RIDDICK, Circuit Judges.

JOHNSEN, Circuit Judge.

This case involves an application of the principles which have been set out in No. 12,793, In re Kansas City Journal-Post Co. (Bostian v. Shapiro), 8 Cir., 144 F.2d 812, decided concurrently herewith, and which need not be repeated here.

The question is whether Newman, president of the bankrupt corporation, had a substantial adverse claim to $75,900 withdrawn by him from the corporation's bank account some time before the bankruptcy, so that he could not, except with his consent, be made subject to a turnover order in summary proceedings. Newman had objected to the summary jurisdiction of the referee and had set out in his response the matters which he contended made him an adverse claimant. A hearing was held, and evidence was adduced.[1] The referee found that Newman was withholding the funds "without the slightest color of title", and entered a turnover order against him. The District Court set aside the order "for want of jurisdiction in the referee to make the order in a summary proceeding." See 51 F.Supp. 1009, 1018, 1019.

As indicated in our opinions in Nos. 12,791 and 12,793, the evidence showed that, some months before the bankruptcy, Newman had made a contract, in his own name as agent, with General Properties Co., Inc., for the purchase of the secured bonds, some unsecured notes and the capital stock of the insolvent Kansas City Journal-Post Company. Newman later formally assigned the contract to Morris Schapiro,[2] but both he and Schapiro claimed that the actual arrangement between them was that Schapiro was to take everything under the contract except the capital stock, and that Newman was to have the stock. General Properties, which was a Henry L. Doherty family-corporation, had been anxious for some time to get rid of its newspaper interest and was willing to take a radical discount on Doherty's investment, but it still desired to see the newspaper kept going as long as possible. The contract was accordingly made to contain a provision that, in addition to the $100,000 which was to be paid direct to General Properties, the purchaser, as "part consideration for the transfer of said stock, bonds and notes," should "contemporaneously with the delivery of said securities and payment therefor * * * cause to be paid into the Kansas City Journal-Post Company $100,000 additional cash working capital

---

[1] As in No. 12,793 the evidence here consisted of the testimony which had been introduced in No. 12,791, In re Kansas City Journal-Post Co. (Bostian v. Schapiro), 8 Cir., 144 F.2d 791, this date decided.

[2] The contract actually was assigned to Schapiro's attorney as agent, in order that Schapiro's name would not appear in the transaction.

and the furnishing of said additional working capital is a condition precedent." It was further provided that for this $100,000 capital addition the purchaser was to be issued 500 new shares of stock.

In form, the contract was a written offer by General Properties to sell, with a notation of acceptance by Newman as agent, which declared that the offer was accepted upon the condition [3] that, at the time of the payment of the money and the delivery of the securities, there also should be delivered to the purchaser an assignment of the International Paper Company's account against the insolvent corporation in the sum of $240,663.98 and accrued interest. Newman collaborated with the General Properties' representative in attempting to obtain the assignment, but International Paper refused to give it except upon certain conditions which Newman declared were unacceptable. The offer had provided that time was of the essence, and, on the date agreed upon for performance, the parties got together, and General Properties delivered to Schapiro's attorney the bonds, the notes and the certificates of capital stock assigned in blank, and Schapiro's attorney turned over to General Properties a cashier's check for $100,000 endorsed payable to its order and another cashier's check for $100,000 endorsed payable to the order of the newspaper corporation. There was also delivered to Schapiro's attorney a certificate in his name as agent, for the 500 new shares of stock which were to be issued for the $100,000 capital addition.

Newman was then elected president of the newspaper corporation, and General Properties turned over to the corporation the $100,000 cashier's check for which the 500 new shares of stock had been issued. The board of directors of the corporation by resolution authorized Newman to open an account with the funds in a local bank in the corporation's name and, as president, to draw checks on the account. The account was opened on the bank's records as a general checking account of the corporation. Within three hours after the opening of the account, Newman drew a check on it for $24,000 in favor of Schapiro's attorney, covering the amount which he and Schapiro claimed it had been agreed between them that Newman was to pay for the capital stock. Within a few days thereafter, Newman drew another check on the account for $75,000 in favor of the bank [4] and had the bank issue New York drafts therefor payable to his own order. Out of the proceeds of these drafts, he purchased some eastern real estate and paid off a mortgage on some other property. Later he drew another check for $900 to his own order and received the cash. The corporation thus was left with only $100 of the $100,000 in its bank account at the time involuntary bankruptcy was instituted. It is the $75,900 which Newman personally received from these withdrawals and appropriated that is the subject of this summary proceeding.

Newman admitted in his testimony that he had no authority from the board of directors to withdraw or use any of the corporation's funds for personal purposes. His contention, however, was that as to the $100,000 deposit he needed no such authority; "that it was never contemplated by said agreement that such sum of $100,000 should be paid into the said Kansas City Journal-Post Company except upon compliance with all the terms and conditions of said contract and agreement"; "that said deposit was not for the benefit of said Kansas City Journal-Post Company or any creditors of the said Kansas City Journal-Post Company until said agreement was fully complied with, being deposited in said account in the name of said Kansas City Journal-Post Company only in contemplation of the fulfillment of said agreements and to be used solely for the purpose of additional cash working capital after the corporation had been placed in the position contemplated by said agreements"; "that until such time said funds were and remained in fact the property of said Harry Newman who alone was authorized to draw on said account"; that General Properties had not delivered the assignment of the International Paper account,[5] which was one of

---

[3] There were some other conditions also, not here material.

[4] The bank in opening the account had required the board of directors to adopt the customary protective resolution in favor of the bank on checks issued by an officer to his own order.

[5] The evidence shows that at the time the contract was made General Properties had also orally agreed to obtain

the conditions of acceptance imposed by the purchaser;[6] and that, until such a delivery actually was made, the money in no sense belonged to the newspaper corporation and Newman had the right to do with it as he liked.

But the absolute effect of the things that the parties had done in connection with the transfer of the securities and the payment of the money left Newman without any semblance of legal right to withdraw the $100,000 or any part of it, without authority from the board of directors, for his personal use. His contention that the $100,000 was "my money" is mere bald assertion. As between the seller and the purchaser, it was paid over as part of the consideration for the transfer of the bonds, notes and stock. As against the newspaper corporation, it was in law a payment for the 500 new shares of stock, which were issued to and accepted by the purchaser. If it was agreed between the seller and the purchaser, with the newspaper corporation's consent, that the transaction was to remain subject to the performance of the condition that an assignment of the International Paper account should be furnished, then the condition may have been converted into a condition subsequent, and the situation may have been left sufficiently open so that the purchaser would have had a right to rescind.

But that does not help the situation here, for Schapiro neither attempted nor wanted to rescind. He did not see fit to let loose of his profit-making opportunity on the bonds, but brought foreclosure upon them instead, and, on the basis of his foreclosure-sale bid, apparently stood to make a profit of at least $50,000 above the $200,000 total purchase-price investment. And, of course, if the transaction had been thus rescinded, the 500 shares of stock issued for the $100,000, which Newman and Schapiro retained, would have had to be surrendered to the newspaper corporation.

But, beyond this, there is another element also in the situation which, apart from what has been said, makes Newman's contention that the money was his to do with as he pleased utterly devoid of any legal foundation. If the General Properties transaction still remained open and the $100,000 was to be held until the International Paper assignment was delivered, it clearly was the newspaper corporation that was to hold the funds and not Newman. The $100,000 cashier's check admittedly was turned over to the newspaper corporation, and so was placed legally under the control of the corporation's board of directors, for the doing of whatever the corporation was supposed to do with the funds. The cashier's check never came into Newman's hands as an individual but only as president of the corporation. His only authority to deal with it was acquired from the board of directors. That authority, on the record, was to deposit the check to the account of the corporation, with the right to draw checks on it as president, for the uses of the corporation. He never received authority from the board of directors to withdraw any part of the money to buy property or pay off mortgages or for any other personal purposes.

The testimony in the record that New-

---

and turn over to the purchaser some notes in the face amount of $58,000 held by two other Doherty corporations for advances they had made to the newspaper corporation. These notes too were not delivered at the time the stock, bonds and notes were transferred and payment was made, but Newman admitted in his testimony that they were not so "terribly important." In any event they add nothing to the legal situation being considered that is not present in the failure to furnish an assignment of the International Paper account and hence will not further be mentioned.

[6] Both the referee and the District Court held in No. 12,791, In re Kansas City Journal-Post Co. (Bostian v. Schapiro), that Schapiro and Newman, in accepting the stock, bonds and notes and making payment of the $200,000, had waived the condition that the International Paper account should be assigned. But that determination cannot, of course, constitute an adjudication here, nor do we have any right to determine the question in this proceeding if it presents a substantial issue of right. For purposes of the jurisdictional question here involved, we are accepting the testimony of Newman and Schapiro's attorney that General Properties had promised at the time of the transfer of the securities and the payment therefor that an assignment of the International Paper claim would be furnished within a few days and that Schapiro and Newman relied upon that promise.

man at all times insisted that the money "ought (not) to be used for the benefit of the company until the International Company assignment was delivered" or that it "was and wouldn't be available from his point of view until the International Paper account was assigned", or that it "would not be used until those things were taken care of," could therefore not possibly affect the clear legal absoluteness of the situation, that, whatever was to be done with the funds, whether they were to be held, returned, or used, it was the board of directors that had that authority and not Newman. The only authority the board of directors had given Newman, as already stated, was to use the funds for corporate purposes; he had no authority to make a withdrawal for any other purpose. Except as a use of them might be made for corporate purposes, the funds legally belonged in the corporation's bank account and not in Newman's pocket or in Newman's land.[7] Except for the fact that Newman was president of the corporation, he would not have been able to have gotten his hands upon the funds. Placing his hands upon them for the purpose which he did was a clear legal abuse of the functions of his office. He cannot assert that he had any colorable right against the corporation, by this abuse of his office, to take the law and the money into his own hands for the purpose of personally adjusting or protecting himself in any grievance he might have against General Properties.[8] The money legally belonged in the treasury of the corporation, still belongs there, and the trustee is entitled to have it restored. His contention that he is an adverse claimant does not, under these circumstances, in law present "some fair doubt and reasonable room for controversy," but is a mere pretense and utterly without any legal justification.

■ It has been argued that the order of the District Court should be affirmed on the ground that the referee failed to make a preliminary inquiry on the question of jurisdiction. But the referee's finding that Newman had not "the slightest color of title" to the funds expressly indicates that there had been a determination of the question of jurisdiction. As to the formalities of the proceeding, the record shows that the hearing consisted of an offer by the trustee of the evidence previously introduced in No. 12,791; its receipt without any objection by Newman; a statement that Newman did "not care to put on any further testimony"; a further statement by Newman's representative that "there will be no further hearing of any kind on the issues"; and an offer by the referee to receive and consider any briefs filed by either party within a limited time. This clearly was a submission of the case, on both the question of preliminary inquiry and the merits, with the right in the referee to make a summary adjudication without further proceedings if he found that jurisdiction existed.

Newman has stipulated that for purposes of this proceeding, if he is properly subject to a turnover order, the $75,900 is to be regarded as having been placed by him in the Habosa Company; that that company is in legal effect his personal corporation; that the assets of the corporation are available to satisfy a turnover order for the funds; and that "Mr. Newman's decisions would be the corporation's decisions as to that matter."

The order of the District Court is reversed, with directions to affirm the turnover order made by the referee.

---

[7] Incidentally Schapiro's attorney testified that: "I left a check for $100,000 endorsed to the Kansas City Journal-Post Company, and couldn't imagine it going any place other than to the credit of the Kansas City Journal-Post Company."

[8] Whether Newman actually could have any legal grievance in the situation, in view of the fact that he had assigned the contract to Schapiro, that he admitted Schapiro was the one who was to have the assignment of the International Paper account, and that the evidence showed that Schapiro never had agreed to cancel, and had no intention to cancel, the account as against the newspaper corporation, there is, of course, no occasion for us to discuss.