## In re HEADLEY.

(District Court, W. D. Missouri, S. D. November 13, 1899.)

### No. 32.

1. BANKRUPTCY—PROOF OF CLAIMS—POSTPONEMENT FOR FRAUD.

Where a national bank bought a judgment of record against one of its debtors, paying much less than its face value, and caused execution to be issued thereon and levied on the debtor's goods, under a secret arrangement between the parties that the execution, after reimbursing the bank for the amount actually advanced, should be managed for the benefit of the debtor, so as to protect him against his other creditors, and with the result of delaying and defrauding the latter, and within four months thereafter the debtor was adjudged bankrupt, and the bank proved a claim against his estate for the whole amount of the judgment, and had the same allowed. *held*, that such allowance should be set aside, and the claim of the bank postponed to the claims of other creditors.

2. SAME—SETTING ASIDE ALLOWANCE OF CLAIM—FRAUD.

The allowance of a claim against a bankrupt's estate, in favor of an assignee thereof who acquired it after the adjudication, but from an innocent and bona fide holder, in whose hands it was valid and provable, will not be set aside upon an allegation by other creditors that such assignee bought the claim for the purpose of acquiring a majority interest in the estate, of controlling the bankruptcy proceedings in the interest of the bankrupt and himself, and of hindering and defrauding the other creditors, when it does not appear that such fraudulent purpose has actually been carried out, to the injury of other creditors.

8. SAME—SECURED CREDITORS.

Where judgment is recovered against two co-defendants, and execution thereon is levied upon the property of one of them, and the other is ad-

judged bankrupt, the judgment creditor may prove his claim against the bankrupt as unsecured.

In Bankruptcy. On review of decision of referee in bankruptcy.

Massey & Tatlow, for plaintiff.

James R. Vaughan, for defendant.

PHILIPS, District Judge. In the progress of the administration of this estate, the referee allowed a claim against the estate, amounting to $12,524, in favor of one W. H. Rosenow. This claim was predicated of two judgments—one in favor of the Market & Fulton National Bank of New York, and the other in favor of the Phœnix National Bank of New York—against said Headley rendered some time prior to the proceedings in bankruptcy against said Headley. The assignors of said judgments are the petitioning creditors, at whose instance said Headley was adjudged a bankrupt; and the assignment was made to said Rosenow after the adjudication in bankruptcy. The consideration for this assignment was the sum of $2,750, claimed to have been paid by said Rosenow. The fact is found by the referee, on the hearings of evidence touching this transaction, that this purchase of said judgments was in fact made in the interest and for the benefit of the National Exchange Bank of Springfield, Mo. The court is satisfied, on examination of the whole evidence and surrounding circumstances of the transaction, that the National Exchange Bank was the real purchaser, and that said Rosenow was used by the National Exchange Bank as the mere instrument for accomplishing by indirection what it hesitated to do directly, the reason for which is to be found, doubtless, in two facts:

First, out of an apprehension of the bank that the purchase of a claim against an insolvent bankrupt estate was not in the usual and ordinary course of business of a national bank, whose powers are defined by section 5136, Rev. St. U. S., which authorizes national banks to discount and negotiate promissory notes, drafts, bills of exchange, and other evidence of indebtedness. It is quite inferable from the contradictory statements of said Rosenow and the president of the bank, on examination before the referee touching this transaction, that the purchase of these judgments was not a matter passed upon formally by the discount board of the bank, and it was the purpose of the president of the bank that the bank should not be known primarily in the transaction between the assignors and the assignee of the judgments; and for that reason the assignment was taken in the name of Rosenow, with the understanding that, while Rosenow may have ostensibly paid the purchase money, he was to be reimbursed or made whole by the bank. As confirmatory proof of this conclusion, since the allowance of the claim in favor of said Rosenow he has made a formal assignment thereof to the National Exchange Bank. Exactly why a national bank should engage in the purchase of such paper by such indirect methods is not made clear by the bank. The charge is made by Lucy A. James, one of the creditors of said bankrupt estate, who has filed a motion before the referee to have said allowance in favor of said Rosenow set aside and postponed to

her claim, that the object of the bank was to control the proceedings in bankruptcy in the interest of said bank and said Headley, the bankrupt, and for the purpose of hindering, delaying, and defrauding the other creditors of said bankrupt, including the petitioner. The referee set aside said allowance and disallowed the claim on the ground that the bank was the real party in interest, and that the object of Rosenow and the bank was to enable the bank to control the proceedings in bankruptcy, and to hinder and delay the other creditors of the bankrupt. This action of the referee has been certified to this court for review.

To properly understand this issue of fact and law, it is important to consider it in connection with the history of the claim of the National Exchange Bank for $37,486.20, which was first allowed by the referee, and afterwards set aside by him on petition of Lucy A. James, a creditor of the bankrupt, except the sum of $2,500 allowed by the referee as equitable, which action of the referee has also been certified to this court for review. A brief recitation of the history of the dealings between said bank and the bankrupt, as found by the referee and reasonably deducible from the evidence, discloses substantially the following state of facts: Beginning back in 1897, the bankrupt, F. E. Headley, was president and a large stockholder of the Headley Grocery Company, a corporation doing a wholesale grocery business in the city of Springfield, Mo. At that time said Headley was indebted to said bank in the sum of about $10,000, for which the bank held his note, with one W. W. Coover, an officer and stockholder in said grocery company, as security thereon, which note was indorsed by O. M. Headley, a brother of F. E. Headley. Later, F. E. Headley and said grocery company being hard pressed, it was arranged between F. E. Headley and the president of said bank that this note should be replaced and taken up by the substitution of a note signed by said Headley Grocery Company and F. E. Headley and W. W. Coover; leaving O. M. Headley, indorser of the original note, out of the new note. Shortly thereafter the president of said bank obtained a deed of trust on said grocery company's property, making said bank and another bank preferred creditors, and thereafter said grocery company made a general assignment for the benefit of creditors. One F. R. Massey was named as trustee under the deed of trust, and Charles A. McCann was made assignee in said deed of assignment. Both said Massey and McCann were intimate friends and business associates of the president of said bank, and were also stockholders in the concern of Keet-Rountree Shoe Company, a corporation doing business in Springfield, Mo.; the said Keet being president of said bank. The said trustee took possession of the stock of goods of the Headley Grocery Company, and, after selling at retail a part of the stock, sold the residue in bulk to the Springfield Grocery Company, another business corporation of Springfield, of which said Keet, president of said bank, was vice president and a large stockholder. Keet, representing said Springfield Grocery Company, sold the goods so obtained to F. E. Headley, M. L. Middleton, and E. D. Seaman, within three days after said trustee's sale, at a profit of $1,000, out of which stock said F. E. Headley, on a division between him and said

Middleton and Seaman, obtained $4,000 worth of goods and $1,928 in cash; and out of the goods and real estate of said Headley Grocery Company the said bank obtained and applied as a credit on said note of $10,000 the sum of $8,500. Afterwards the bank brought suit in the circuit court of Greene county, Mo., and obtained judgment against said Headley Grocery Company for the balance of said note, leaving out of said suit said F. E. Headley and said Coover. The result of these proceedings was that the grocery company, a corporation, was induced to execute its note for a debt of said F. E. Headley, for which the said grocery company was in no wise primarily liable; and the property of the grocery company was taken to apply to the payment of F. E. Headley's individual liability, whereby F. E. Headley and his brother, the indorser, were entirely let out of this debt. This action on the part of the corporation was clearly ultra vires, and there can be but one conclusion drawn therefrom, and that is that the bank and F. E. Headley were acting in concert for the protection and benefit of said F. E. Headley in his individual capacity. The assets of the grocery company were thus absorbed by the bank and F. E. Headley, and the assignee, Charles A. McCann, obtained nothing under the assignment, and the general creditors of the grocery company were left wholly unprovided for. The trustee, Massey, under said deed of trust, thereafter obtained judgment against F. E. Headley in the circuit court of Greene county, Mo., in favor of the beneficiaries of said deed of trust, in the sum of $37,000. This judgment said Massey sold at public auction, and said National Exchange Bank became the purchaser thereof at the sum of $2,000.

After F. E. Headley withdrew from the Middleton-Seamans concern, the evidence discloses that he set up another grocery concern in Springfield, in the name of his brothers. His interest in this concern was concealed from the public. In the fall of 1898 the objecting creditor herein, and other creditors of said Headley, caused executions to be issued on their judgments against him. It is quite inferable from all the facts and circumstances in evidence that F. E. Headley became apprehensive that his concealed interests in said concerns might be uncovered by these execution creditors; and therefore his attorney, who seems to have also sustained the relation of attorney or adviser to the bank, entered into an understanding with the president of the bank that an execution should issue on said judgment of $37,000 held by the bank against Headley, and levy it on all of Headley's interests, and so manage it that after the bank should obtain therefrom the sum of $2,000 and interest, which it paid at the trustee's sale for said $37,000 judgment, the balance should inure to Headley's benefit. Accordingly, execution on this $37,000 judgment was issued, and levied upon the capital stock of the Headley Bros. Grocery Company; and said Middleton and Seaman were garnished, and funds of theirs in another bank were tied up by this proceeding. The conclusion cannot be resisted that the attorney of F. E. Headley was managing and controlling this execution in the interest of said Headley, and that the bank was merely lending itself, through this proceeding, to accomplish the result of obtaining for itself the money it had paid for said judgment, while consenting that the execution

might thus be employed to protect Headley against his other creditors. This execution in favor of the bank was levied on the Headley Bros. Grocery Company on October 8, 1898, under which nothing was immediately done by way of sale, whereupon the objecting creditor herein caused an execution to be levied on the same capital stock. Thereupon the stock, under the bank's execution, was advertised and sold on the 30th of December, 1898, and the bank became the purchaser. Headley was left in possession of the goods after this sale, and ran the business, apparently without let or hindrance, in his own way, until the trustee under the bankruptcy proceedings on the 11th day of March, 1899, took possession thereof. It does not appear that Headley during his pretended agency made accountings to the bank. The evidence tends to show that the amount of said stock of goods which passed into the control of Headley for the bank was $5,000, and at the time the trustee in bankruptcy took charge was reduced to about $500, and which the bank bought in at trustee's sale in bankruptcy.

While the transactions had between the bank and this bankrupt, antedating the enactment of the bankrupt law, cannot be, in and of themselves, held to be a fraud upon the bankrupt act, yet it is competent to investigate and develop the same, as bearing upon the question of a fraudulent combination between the bank and the bankrupt after the adoption of the bankrupt act, and within four months preceding the adjudication in bankruptcy. It may be conceded to the contention of the bank in this controversy that it had a right to purchase the judgments amounting to $37,000 against said Headley, if it was done in the usual and ordinary course of business of the bank, or to better secure its claims against the bankrupt. But it is inconceivable that a national banking institution would take out of its bank the sum of $2,000 in money to invest in a judgment against a man known at the time to be bankrupt, and whose assets were of such character as to make any dividend among the creditors of his estate a very uncertain quantity. Such a purchase on the part of a national bank must excite grave suspicion, and should devolve upon the bank the most satisfactory explanation and proof to show that it was free from any purpose to assist the debtor in hindering and delaying his other creditors. And even if this acquisition of the judgment against the bankrupt was made in the ordinary course of legitimate banking business, while the bank had the right, in the race of diligence between creditors, to take any and every legitimate step to obtain its debt from the debtor, the very moment it employed, or suffered to be employed, the execution in its favor to protect the property of the common debtor against the just claims of other creditors, by hindering them in the interest of the debtor, it was a misuse of its claim, and was in fact and law a fraud upon the other creditors. Taking the whole history of the dealings between the bank and the bankrupt, with the practical results, it is difficult for an honest mind to escape the conclusion that the bank, throughout, while protecting itself, was likewise aiding and abetting the debtor to prevent other creditors from obtaining anything from his property, and that, while apparently employing the judgment of $37,000 and

97 F.—49

the execution thereon to obtain a preference in favor of the bank over the other creditors, the secret understanding existed between the bank's president and the bankrupt that when the bank obtained out of the proceeds of the execution its purchase money of $2,000, with interest, the bankrupt's attorney was free to employ the execution for the whole sum, so that the residue, after paying the bank the $2,000, interest, and expenses, should inure to the benefit of the bankrupt. Under all the authorities, this was a fraudulent combination and scheme, which should postpone the claim of said bank for the amount of said judgment against the bankrupt estate. The bankrupt law is administered upon lines of equity jurisprudence, and, as between contending creditors, the bankrupt court, in the interest of fair dealing and good conscience, has the unquestioned power to postpone the claim of such a creditor in favor of the other creditors. "When a creditor by fraud will attempt to defeat the claims of other creditors, there is no hardship in postponing his demand, although a just one, to those which he has endeavored to defeat." State v. Hope, 102 Mo. 431, 14 S. W. 990. It is the established doctrine of this state that the priority of an execution creditor who acts in collusion with the execution debtor may be avoided on motion after the return of the execution. "This doctrine results from the principle that the levy devested the property from the defendant, and to leave such property in the possession of the defendant by the connivance or request of the plaintiff in the execution would be a fraud upon subsequent executions." Wise v. Darby, 9 Mo. 133; Field v. Liverman, 17 Mo. 218; Parker v. Waugh, 34 Mo. 340. So, Bump (Fraud. Conv. p. 504) says:

"The statute avoids all executions issued or kept on foot with intent to delay, hinder, or defraud creditors. The intent may be inferred from circumstances, and, if it is established, the execution loses its preference."

The action of the referee in setting aside the allowance in favor of the bank of this claim of $37,000 is sustained by the court, at least to the extent of postponing it to the claims of other creditors of the estate. In view of the grounds of such conclusion, it would be illogical to allow the bank, as was done by the referee, any part of this claim. This case is therefore returned to the referee, with directions to set aside the allowance of $2,000 on this claim in favor of the bank.

The recitation of facts aforesaid makes it apparent what was the second and underlying motive of the bank in obtaining control of the judgments in favor of the petitioning creditor in involuntary bankruptcy in this case. Why a national bank, with the full knowledge of the condition of this Headley estate, after an adjudication in bankruptcy, when it already held an unsatisfied judgment of $37,000 against him, would take out of its assets $2,750 in money, and invest it in other judgments against the bankrupt, which it knew could not be paid, necessarily excites grave suspicion as to the integrity of the transaction. If, however, it were found that the object of the bank was to obtain by such means control of a majority of the claims against the bankrupt estate, and that it was further induced thereto in order to work out some advantage to the bankrupt, it is not apparent from the facts before the court how such design, if unaccom-

plished, could disentitle the allowance of this claim in favor of the legal holder thereof. No question is made of the validity of the judgments in favor of the New York banks. There is no charge or claim that said judgment creditors were in collusion with said Rosenow or the National Exchange Bank to assist them in accomplishing any fraud upon the other creditors of the bankrupt. It is an established rule of law that a purchaser with notice of a fraudulent scheme may protect himself by purchasing the title of a bona fide creditor without notice. The reason of this rule is stated by Chancellor Kent in Bumpus v. Platner, 1 Johns. Ch. 220, to be "to prevent a stagnation of property, and because the first purchaser, being entitled to hold and enjoy, must be equally entitled to sell." See, also, Funkhouser v. Lay, 78 Mo. 458. As taker under the judgment creditors, the purchaser succeeded to all the rights and equities of the judgment creditors against Headley. If the judgment creditors had remained the owners of the claims, and presented them for allowance against the bankrupt estate, no valid objection could have been interposed against their allowance in full. The transfer of the claims to Rosenow, and their allowance, in no wise altered the condition of the other creditors of the estate. How, then, can it be held that the mere fact that the assignee of the judgments intended to use them in some improper way affect his right to participate in the dividends of the estate, unless such fraudulent purpose was carried out to the injury of the other creditors? As a purchaser, acquiring all the rights and equities of the innocent judgment creditors, the assignee had a right to do what he pleased with the judgments, provided he did not in fact fraudulently employ them to the injury of other creditors of equal right. The action, therefore, of the referee in disallowing this claim is disapproved, and the case is returned to him with directions to set aside his last order vacating the allowance of this claim.

In respect of the suggestion of counsel for the objecting creditor that the New York judgment creditors also held judgments against W. W. Coover, as co-defendant, under which there had been a levy upon the stock of said Coover in certain companies, it is sufficient to say that such fact does not make the judgment creditors secured creditors, within the meaning of the bankrupt act. A "secured creditor shall include a creditor who has security for his debt upon the property of the bankrupt of a character to be assignable under this act, or who owns such a debt for which some endorser, surety, or other persons secondarily liable for the bankrupt has such security upon the bankrupt's assets." Bankr. Act, c. 1, § 1, subsec. 23. Accordingly it is laid down in Coll. Bankr. p. 283, that:

"No matter how great may be the security which one may have, if it be the surety of another than the bankrupt, the creditor may prove his entire claim against the bankrupt's estate, and receive a dividend thereon, and thereafter institute proceedings to enforce the claim upon the security for the balance."

As the creditor's claim exceeds $12,000, and the alleged claim against Coover is $4,500, it is hardly probable that his dividend out of the bankrupt's estate in any event would cover the difference.