144 F.2d 791 (1944)
In re KANSAS CITY JOURNAL-POST CO.
BOSTIAN
v.
SCHAPIRO.
No. 12791.
Circuit Court of Appeals, Eighth Circuit.
August 11, 1944.
Rehearing Denied September 5, 1944.
*792 *793 *794 *795 A. J. Granoff and Samuel W. Sawyer, both of Kansas City, Mo. (Claude A. Ferguson, of Kansas City, Mo., on the brief), for appellant.
R. B. Caldwell, of Kansas City, Mo. (John W. Oliver, of Kansas City, Mo., on the brief), for appellee.
Before GARDNER, JOHNSEN, and RIDDICK, Circuit Judges.
JOHNSEN, Circuit Judge.
The proceeding is one in reclamation in the estate of the Kansas City Journal-Post Company, bankrupt, publisher of the former Kansas City Journal-Post. The trustee of the estate has appealed from an order of the District Court granting the petition of Morris Schapiro to reclaim the building, the machinery, and the other equipment of the newspaper plant, and directing the trustee to turn the property over to him. See 51 F.Supp. 1009. The referee had denied Schapiro's right to reclamation and at the same time had subordinated his rights in the property to the claims of general creditors.
Schapiro's title to the property rested upon his purchase of it at a foreclosure sale, held between the filing of the involuntary petition in bankruptcy and the date of the adjudication, under a power of sale in a Missouri deed of trust securing a $500,000 bond issue. Schapiro had acquired all of the bonds a few months before the bankruptcy and some time later had directed the indenture trustee to foreclose. After the foreclosure sale, Schapiro took possession of the property, but, following the adjudication and the referee's appointment of a receiver, he surrendered the property to the receiver, under protest and without prejudice to his right of reclamation.
The referee denied the reclamation, set aside the foreclosure sale, and subordinated Schapiro's rights on the bonds and the deed of trust to the claims of general creditors, on the grounds that Schapiro had violated a fiduciary duty to the creditors; that he was in fact guilty of perpetrating a gross fraud upon them; that his fiduciary obligation arose out of his having also become the owner of the capital stock of the corporation in the same transaction by which he acquired the bonds; that the contract *796 with the former holder of the bonds and stock required the purchaser, as part of the consideration for the transfer, to put $100,000 new working capital into the corporation  the seller being desirous of having the newspaper kept going as long as possible; that this provision of the contract conferred a benefit and a right upon the creditors of the corporation, which became vested when the transaction was closed; that while the $100,000 new capital purported to have been put into the corporation's treasury at the time the seller transferred the bonds and stock to Schapiro, the money (except $100) was almost immediately withdrawn  a check for $24,000 thereof going into Schapiro's hands the very same day, and $75,000 being drawn out a few days later and appropriated by Harry Newman, who had been instrumental in getting Schapiro into the deal and had been made president of the corporation at the time the transaction was closed;[1] that Schapiro and Newman intended from the start that the $100,000 never should become available to the corporation and its creditors; that Schapiro acquired the bonds and stock with the intention of liquidating the business of the corporation, becoming the owner of all its property and assets, and allowing general creditors to "hold the sack"; that the foreclosure proceedings were part of this fraudulent scheme; and that Schapiro's conduct in the entire situation was so grossly inequitable in relation to his fiduciary duty to the general creditors as to require that the foreclosure sale (held after the institution of bankruptcy) be set aside, Schapiro's lien under his bonds and deed of trust be forfeited to general creditors, and his claim upon the bonds generally be subordinated to the claims of all other creditors. We have stated merely the effect of the referee's memorandum opinion, findings and conclusions, without any attempt to use his exact language.
The District Court held that the referee was not warranted in thus forfeiting Schapiro's lien rights under the bonds and deed of trust to the general creditors; that the evidence did not establish any fiduciary relation and duty to general creditors in respect to Schapiro's purchase and enforcement of the bonds, which could afford the foundation for a subordination of any part of his acquired rights; that Schapiro was not the holder of the corporation's capital stock at the time he contracted to purchase the bonds, nor was his transaction one with the corporation, but it was an arm's-length purchase from a third party of the valid and defaulted obligations of the corporation, without any contractual limitation imposed by the seller on the purchaser's enforcement-rights in favor of the corporation and its other creditors; that Schapiro manifestly was not acquiring the bonds as a philanthropy to the general creditors, but for the obvious purpose at some time of realizing a personal profit thereon; that as an outsider to the corporation he could owe no duty to creditors that would make it inequitable for him to enter into such a deal; that his taking over of the worthless capital stock in connection with the transaction was simply an incident to his acquisition of the bonds, since it clearly appeared that it was his intention to dispose of the stock; that the acquiring of the bonds and the foreclosure of the deed of trust therefore could not be claimed to involve any violation of fiduciary duty or to constitute a fraud upon the general creditors; that general creditors could in no way be injured thereby, because there was no possible equity in the lien property; that the only wrong shown by the evidence to have been done to general creditors was the subsequent withdrawal of the $99,900 new working capital from the corporation's treasury; and that, if Schapiro could be claimed to have been in any way a party to this fraud,[2] and thereby to have violated a fiduciary obligation by virtue of his having become the owner of the capital stock, this still would not warrant the wiping out of his validly-acquired lien rights, under the guise of equitable subordination, since the fraud was wholly unrelated to the transaction by which he had acquired his bond rights. Here also, as in the case of the referee's holdings, we have attempted *797 only to state the effect of the District Court's memorandum opinion, findings and conclusions.
The contentions raised by the trustee on the appeal go generally to the questions whether the District Court took proper cognizance of the findings of the referee, under Order 47, General Orders in Bankruptcy, as now existing, 11 U.S.C.A. following section 53, and whether it was justified in reversing the referee's order on the basis of the principles which it thought controlling. Some of the history preceding the bankruptcy and the foreclosure, as it appears in the record, will perhaps be helpful to a proper perspective and sound weighing of the opposing views of the referee and the District Court.

I.
In 1931, Henry L. Doherty, head of Cities Service Company, made a loan of $500,000 to the Kansas City Journal-Post Company, for which he took bonds of the corporation secured by a deed of trust on all of its property. As part of the transaction he also acquired some capital stock in the corporation. Doherty's object was to obtain a medium of expression for his utility interests in the fight which the Kansas City Star was then making on the gas rates of Cities Service Gas Company in the Kansas City area.
The newspaper corporation paid the interest upon Doherty's bonds for a two-year period, but was thereafter unable to make any further payments because of operating deficits. To keep the paper going, Doherty made some personal advances, for which he took the corporation's unsecured demand notes. In the course of three years he thus advanced $356,100, on which nothing ever was paid either in interest or principal. Two subsidiaries of Cities Service Company likewise made advances to the corporation, totalling $58,000, for which they similarly took unsecured notes. On these notes also, no interest or principal ever was paid.
In 1938, Doherty acquired all of the capital stock of the corporation. He placed a man named McPherson in charge of the newspaper, as publisher, and gave him an option to acquire all of the stock, bonds and notes at a radical discount on Doherty's investment. McPherson attempted to build up the newspaper, but its operating deficits still continued. These deficits were cleared up currently by subsidies from Cities Service Gas Company amounting to approximately $25,000 monthly, but the previously accumulated indebtedness was simply allowed to ride. In 1939 Doherty died, and his stock, bonds and notes of the newspaper corporation were thereafter transferred by the representatives of his estate to General Properties Co., Inc., a Doherty-family corporation. General Properties was desirous of getting rid of its newspaper interest, but McPherson was financially unable to take up the purchase-option which Doherty had given him. McPherson then sought to find some outside purchaser for the newspaper. He finally, in October 1941, got a man named Harry Newman, of Langley, Virginia, and General Properties together in a deal by which General Properties agreed to transfer all its stock, bonds and notes to Newman, as the alleged agent of a wealthy, undisclosed principal, for the sum of $100,000, on condition that the purchaser "contemporaneously with the delivery of said securities and payment therefor * * * cause to be paid into the Kansas City Journal-Post Company $100,000 additional cash working capital and the furnishing of said additional working capital is a condition precedent." The written offer of General Properties further agreed to cause the corporation's articles to be amended to provide for the issuance of 500 new shares of stock, to be given the purchaser in exchange for the $100,000 capital addition.
Newman purported to accept this proposition on behalf of his alleged undisclosed principal, by a notation on the bottom of the written offer, but he added as a condition of his acceptance that there should be delivered to the purchaser at the time of closing an assignment of the old account of International Paper Company against the corporation in the principal sum of $240,663.98. This account had accumulated prior to the time that Doherty became the owner of all the stock of the corporation and had not been pressed for payment since, but all purchases from International Paper subsequent to Doherty's sole ownership had been paid for on a current basis. While the McPherson purchase-option was in effect, International Paper had indicated to him its willingness to assign the old account in consideration of an exclusive long-term contract by the corporation for its future paper needs.
In the deal between Newman and General Properties it was also agreed that the *798 two subsidiaries of Cities Service Company should transfer to the purchaser the $58,000 notes which they held. This arrangement was oral, because General Properties thought it impolitic to include it in the written contract. An oral promise was also made by a representative of Cities Service Gas Company that that corporation would continue its $25,000 subsidies for a 5 or 6 months' period.
Although Newman had claimed that he was representing a wealthy, undisclosed principal, he actually had no principal when the contract was executed. He was somewhat of a commercial adventurer, who had had a slight publishing experience, and who apparently thought he saw an opportunity to tinker with an insolvent metropolitan newspaper without any great risk to himself. After he had signed the contract he was up against the necessity of finding someone to furnish the money for the deal. Through a friend in Washington, D. C., he was placed in contact with Morris Schapiro, a financier and a junk dealer of Baltimore, Maryland. Newman's proposition was sufficiently interesting to Schapiro that he sent his attorney, Morton H. Rosen, from Baltimore to Kansas City, to check up on the plant and the investment security. Rosen advised in favor of taking on the deal. Schapiro then came to Kansas City to inspect the property personally. Thereafter he gave Rosen the $200,000 necessary to be paid under the General Properties contract.
Rosen had Newman make an assignment of the General Properties contract to him as agent, Schapiro not wishing to have his own name appear in the transaction. Rosen procured two $100,000 cashier's checks on a Kansas City bank, payable to his own order as attorney, and met with Newman and the representative of General Properties to close the deal, the offer having been made to provide that time was of the essence. No assignment had been obtained of the International Paper account, but Rosen and Newman decided to go ahead notwithstanding, and to leave that matter to be attempted to be worked out with International Paper in some manner subsequently. The $58,000 notes held by the two Cities Service Company subsidiaries also had not been received, but it was assumed by all the parties that these would be forthcoming without difficulty.
General Properties turned over to Rosen the certificates for all the old capital stock assigned in blank, a certificate issued in his name as agent for the new 500 shares representing the $100,000 capital addition, and the $500,000 bonds and $356,100 notes endorsed without recourse. Rosen delivered to General Properties the two $100,000 cashier's checks, one of which he had endorsed to the order of General Properties and the other to the order of the Kansas City Journal-Post Company. A board of directors' meeting was then held, at which Newman was elected president of the corporation and the opening of a checking account for the corporation in the First National Bank of Kansas City, with the $100,000, was authorized. General Properties gave the newspaper corporation the $100,000 check, and Newman endorsed it on behalf of the corporation and deposited it in the First National account, in accordance with his authority from the board of directors. Within a few hours, he drew a check against the funds for $24,000, payable to Rosen's order as attorney. The money was intended for Schapiro, and Rosen promptly endorsed the check to him. Within four days, Newman further drew a check for $75,000 to the First National Bank as payee, for New York drafts in that amount to his personal order, the proceeds of which he shortly thereafter appropriated to his own use. Later he drew another check on the account to his own order for $900 and received the cash. No part of this $99,900 ever was returned to the corporation or used in its behalf. Newman had no authority from the board of directors to draw checks of the corporation for anything except corporate uses.
Newman, Rosen and Schapiro explained the $24,000 check to Rosen as being a repayment of a personal obligation of Newman to Schapiro. Their story was that, while Schapiro had agreed to advance the $200,000 necessary to close the deal with General Properties, the agreement between Newman and Schapiro was that Schapiro was to pay $176,000 for everything which General Properties was to transfer under the contract, except the capital stock of the corporation; that Newman was to receive all of the capital stock in order to enable him to control and operate the newspaper, and for this he was to pay $24,000 of the $200,000 consideration; that, since Newman did not have the necessary $24,000, Schapiro advanced the entire $200,000, on Newman's promise to reimburse him for the $24,000; and that when Newman handed Rosen the $24,000 check he *799 told Rosen that he had arranged to borrow the money temporarily from the corporation (which was untrue).
The referee and the District Court both held that Schapiro had taken a complete assignment of the General Properties contract from Newman and that on the closing of the deal he became the legal owner of all of the capital stock of the corporation. The referee further found that Schapiro continued to hold the stock at the time he received the $24,000 check, and that he had not attempted to turn it over to Newman until after the institution of bankruptcy proceedings against the corporation in February 1942. The District Court found that "Schapiro intended at some time to turn over the stock he acquired to Newman and to keep for himself the bonds and the deed of trust securing them and the notes," and that he did in fact turn over the stock to Newman and with it the control of the corporation and the $100,000. The District Court, however, did not undertake to fix the time when Newman actually received the stock.
Newman's explanation of his withdrawal of the $75,900 was that it was simply a protective measure until General Properties obtained the assignment of the International Paper account, in accordance with his acceptance condition, and until it also turned over the $58,000 notes from the Cities Service subsidiaries, as agreed; that without an assignment of the International Paper account the newspaper was hopelessly insolvent and could not possibly hope to continue operating; and that in his view the corporation had no right to the $100,000 until the assignment of the International Paper account had been furnished. Both the referee and the District Court held that, under the circumstances of the closing, the condition that the International Paper account should be assigned was waived.
After rumors reached General Properties, Cities Service Gas Co., and International Paper that the $100,000 had been almost immediately withdrawn from the corporation, they became suspicious of Newman. The publication of the newspaper, however, had been continued, and Newman attempted to give plausible assurance that the $100,000 was available and would be promptly restored, as soon as satisfactory arrangements had been worked out with International Paper. He and the attorney who had represented General Properties in the closing, and who had remained on as attorney for the newspaper corporation, were still carrying on negotiations with International Paper. Cities Service Gas Co., momentarily at least, became persuaded by Newman's assurances, and it paid over $50,000 of the accumulated subsidies which it had promised. Throughout the negotiations with International Paper, both before the closing of the deal with General Properties and after, International Paper had attempted to impose conditions on its assignment, which it modified from time to time, but none of which was acceptable to Newman. Finally the situation became hopelessly deadlocked, and on February 20, 1942, International Paper instituted bankruptcy proceedings against the corporation, with a consent adjudication thereafter being entered on April 15, 1942.
In November 1941, about a month after the transfer of the securities and the payment of the money, and when the negotiations with International Paper were not reaching a satisfactory solution, Schapiro had the indenture trustee make formal demand upon the corporation for payment of the bonds, as a foundation for foreclosure. In January 1942, he instructed the indenture trustee to proceed with foreclosure under the power of sale in the deed of trust. The attorney for the newspaper corporation, who had represented General Properties in the closing of the deal, and who was hopeful that the newspaper could be kept going, apparently believed that there still was a chance of obtaining a satisfactory assignment from International Paper, and he accordingly requested Schapiro to withhold foreclosure. Schapiro did so, and the situation drifted, with further unsuccessful negotiations, until International Paper finally filed a bankruptcy petition against the corporation. Thereupon the indenture trustee, on February 26, 1942, at Schapiro's request, proceeded with publication of the foreclosure-sale notice, and on March 23, 1942, it held a public sale, without interference from the bankruptcy court, at which Schapiro bid in the property for $250,000, as a credit upon the amount due on his bonds, and the indenture trustee gave him a deed of conveyance and a bill of sale for the property. What occurred thereafter has already been sufficiently related.

*800 II.
The trustee's argument here is primarily an attempt to justify the referee's action in subordinating Schapiro's rights on the bonds and deed of trust to the claims of general creditors, and to persuade that the District Court erred in refusing to approve the subordination. What the referee had done was to refuse to recognize the foreclosure sale and to exercise the bankruptcy court's equitable powers of subordination in relation to Schapiro's resulting lien claim, to the point of wiping out the lien of the deed of trust, bestowing the lien property upon the general creditors, and relegating Schapiro to a position where he would lose his entire purchase-investment, as well as such distributive incidents as would have existed on the bonds in favor of the previous holder.[3]
The subordination of a claim in bankruptcy is simply an exercise of the court's general power under the statute to adjust equities among creditors in relation to the liquidation results. Bankruptcy Act, §§ 2, 57, sub. k, 11 U.S.C.A. §§ 11, 93, sub. k. It is a viewing of the relative disparities in claim levels through the eyes of equity and a dealing with them on the basis of equitable considerations to preven injustice or unfairness in the bankruptcy situation. 3 Collier on Bankruptcy, 14th Ed., § 57.14; 6 Remington on Bankruptcy, 4th Ed., § 2875. In general compass, subordination is usually said to be aimed at leveling off, as practicably as possible, the effects of "the inequitable conduct of a claimant in acquiring or asserting his claim." Prudence Realization Corporation v. Geist, 316 U.S. 89, 95, 62 S.Ct. 978, 982, 86 L.Ed. 1293. In specific application, it may, among other things, seek to offset the detriment or prejudice which any creditor has caused to the claim position of another, In re Bowman Hardware & Electric Co., 7 Cir., 67 F.2d 792, 795; to nullify any unjust enrichment in fiduciary relation[4] affecting the bankruptcy results, Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; and to make the claim position of corporate officers responsive generally to the sound sensitivities of their position and to the practical realities underlying any transactions they may have had with the corporation, Goldie v. Cox, 8 Cir., 130 F.2d 690; Boyum v. Johnson, 8 Cir., 127 F.2d 491; and see also Barlow v. Budge, 8 Cir., 127 F.2d 440.
While a bankruptcy proceeding, of course, "is not itself a suit in equity", Columbia Gas & Electric Corporation v. American Fuel & Power Co., 322 U.S. ___, 64 S.Ct. 1068, 1071, 88 L.Ed. ___, but a composite of "jurisdiction at law and in equity", 11 U.S.C.A. § 11, the court essentially, in dealing with creditors' claims, "sits as a court of equity", Pepper v. Litton, 308 U.S. 295, 307, 60 S.Ct. 238, 246, 84 L.Ed. 281, but "not without appropriate regard for rights acquired under rules of state law", Prudence Realization Corporation v. Geist, 316 U.S. 89, 95, 62 S.Ct. 978, 982, 86 L.Ed. 1293. It must always be remembered that bankruptcy usually is the road's end for all creditors' rights, and for practical purposes the doing of equity in its claim situation is therefore primarily the achieving of fair and just results in relation to the amounts which creditors will realize from the liquidation.
Subordination is a means of regulating distribution results in bankruptcy by adjusting the order of creditors' payments to the equitable levels of their comparative claim positions. As indicated above, its fundamental aim is to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results. Its most common uses perhaps are to nullify the effect of any fraud that a creditor has committed, to prevent unjust enrichment in a fiduciary relation, and to make the transactions of officers with the corporation conform to their sound realities in the existing situation.
But since bankruptcy, as we have suggested, is a final liquidation, the power of subordination necessarily must be measuredly and not blankly exercised. It must have a sound regard for the distribution results that will be produced to the creditor whose claim is being subordinated, as well as to the other creditors. It should not operate to take away anything punitively to which one creditor is justly entitled in view of the liquidation finality, and bestow it upon others, who in the relative situation *801 have no fair right to it. It can therefore ordinarily go no farther than to level off actual inequitable disparities on the bankruptcy terrain for which a creditor is responsible, to the point where they will not create unjust disadvantages in claim positions and liquidation results.[5] And most especially, where there is an attempt to adjust equities between creditors of different legal classes, such as a lienholder and general creditors, must any subordination made of a higher legal right be scrupulously measured and fitted to the actual injury that has been done or the unjust enrichment that is involved.
We agree with the District Court that the referee clearly went beyond the bounds of doing equity in the present situation. To understand just what the referee attempted to accomplish, it should be mentioned that, in addition to denying Schapiro's reclamation petition and subordinating his lien rights to the claims of general creditors, the referee also had permitted the trustee to institute separate proceedings and had entered orders therein, requiring Schapiro to restore the $24,000 which he had received from Newman, and Newman to turn over the $75,900 which he had withdrawn and appropriated to his own use.[6] The referee's subordination order here, therefore, was not made in relation to or for the purpose of leveling off any part of the loss of the $99,900 itself. The subordination was made solely because the referee felt that Newman and Schapiro both had been guilty of fraud in fiduciary relation and should be punished therefor, and that he accordingly had the right to deprive Schapiro of his entire lien, make Schapiro lose his $200,000 purchase-investment, and give general creditors $250,000 worth of lien property[7] on which they had never had any legal hold.
On the facts in the record, we are unable to see how there has been any legal or equitable wrong done general creditors except in the withdrawal of the $99,900, or how, with the $99,900 restored, which the trustee has chosen to seek to effect by separate proceedings, their position in the liquidation could be any different than it would have been if the funds had remained in the corporation's treasury. The referee's memorandum opinion declares that Newman and Schapiro owed the duty "to make an honest effort to use the new working capital of $100,000 to continue the business of the Kansas City Journal-Post Company," and that their failure to do so was responsible for the bankruptcy proceedings. So far as publication of the newspaper was concerned, however, that had been regularly continued from the closing of the deal with General Properties until the institution of bankruptcy by International Paper necessarily forced its suspension.
Doubtless the withdrawal of the $99,900 was what precipitated the involuntary bankruptcy, but, so long as the huge claim of International Paper hung over its head, the corporation necessarily was hopelessly insolvent and was subsisting on creditors' grace. The withdrawal of the $99,900 by Newman was legally unjustifiable, but, from the history in the record, it certainly could not be contended that, even with this money in its treasury, the corporation had any possible chance of ever operating itself into solvency. For ten years it had had an operating deficit of approximately $300,000 a year, and only the monthly subsidies of Cities Service Gas Company had kept it from going deeper and deeper into the morass. Once those subsidies ceased, its doom, on its existing financial structure, was inevitably sealed. All that creditors therefore would have had any sound right to demand was that the $99,900 should be used to apply upon their accumulated indebtedness. The record certainly does not warrant an inference that there was any other use of it that could have benefited the existing creditors. When the money should have been divided fully among them, whether through payment by the corporation or on distribution in bankruptcy, they would have gotten all of the fruits of the General Properties deal to which they ever could have had any legal or equitable right.
*802 What other justification did the referee give for holding that general creditors were entitled to receive the $250,000 windfall in lien property, quite apart from the recovery of the $99,900 which he had chosen to have the trustee deal with in separate proceedings? The referee said that the $250,000 in lien property should be taken away from Schapiro and given to the general creditors, because, when Schapiro went into the deal with General Properties, he did so with the intention of defrauding the general creditors and he attempted to carry out the fraudulent scheme. So far as direct proof is concerned, the attribution of any such an initial intent must be regarded as resting wholly upon the fact that the $99,900 was withdrawn by Newman almost immediately after the deal with General Properties was closed and that Schapiro received $24,000 of it. We shall discuss later how far Schapiro can legitimately be said to have been connected with the fraud. Assuming momentarily that he was a full party to it, it is clear that, whatever fraudulent intent Schapiro may have had, either initially or after the deal was closed, no part of it ever became active or operative against the rights of general creditors, except the withdrawal and appropriation of the $99,900.
There could be no fraud against general creditors, either actual or constructive, in the mere fact that Schapiro acquired General Properties' lien rights at a discount. General Properties wanted to sell and had a right to transfer its lien securities to Schapiro on whatever basis it saw fit. It was neither legally nor equitably obliged to donate any part of these superior rights to general creditors, nor did it undertake to do so. Schapiro equally was entitled to buy on any basis that he was able. The fact that in the same transaction he was also acquiring the stock of the corporation would not of itself give general creditors any hold upon the lien property. As the District Court held, Schapiro was an outsider to the corporation in making his bargain, and there was therefore, as against the creditors, no abuse of fiduciary position or unjust enrichment in fiduciary relation involved in its making. The fact therefore that he jointly acquired the lien rights and the stock, and that he admittedly intended at some time to claim the profits of his lien bargain, could not ipso facto be said to constitute an inequity against general creditors. And even if he had actually been in a fiduciary position at the time he undertook to acquire the lien securities at a discount, the referee clearly would have had no right on that fact alone to forfeit his investment, but "only to prevent the fiduciary from profiting." Restatement, Restitution, § 196, Comment e.
The referee, however, further declared that Schapiro's subsequent attempt to foreclose the deed of trust "was part of a general scheme to defraud the general creditors." Just how a foreclosure of valid lien rights on property in which general creditors had no possible equity, at a time when the bankruptcy petition had made further continuance of the corporation's business impossible and liquidation manifestly was impending, can be termed a fraud upon general creditors or part of a scheme to defraud them, it is difficult to see. It is true that Schapiro had previously threatened to foreclose when the negotiations for an assignment of the International Paper account appeared to have broken down, but, when the attorney for the newspaper corporation requested the opportunity to attempt further negotiations, the foreclosure was withheld. Whether a foreclosure at that time would have constituted a breach of faith on Schapiro's part under his deal with General Properties, and, if so, whether it would have been a matter of which equity might in any way be able to take cognizance on behalf of general creditors, we need not consider, for, as previously stated, the fact is that the foreclosure was not brought until after general creditors had instituted bankruptcy and demanded liquidation. Certainly, in that situation, it would not seem that the liquidation of a valid lien against property in which general creditors had utterly no equity, no matter how it was accomplished, could constitute a fraud upon them, nor entitle them to a gift of the lien property by subordination or otherwise.
Repeating what already has been said, the only fraud or inequity shown to have been perpetrated upon general creditors was the withdrawal of the $99,900 from the corporation's treasury. There was no other basis in the record on which the referee could undertake to limit or to level off Schapiro's lien rights. Whatever else the referee may have believed that Schapiro intended to do could hardly afford a basis for any subordination of his lien rights, for the equitable powers of a bankruptcy court in claim allowance and dividend *803 distribution do not reach to the punishment of improper thoughts or intent, but only to the undoing of inequitable acts and the prevention of unjust liquidation results in relation to them. Cf. In re Headley, D. C.W.D. Mo., 97 F. 765, 771.[8]

III.
We turn to the question of how far Schapiro could be said to have been connected with the fraudulent withdrawal of the $99,900, and how far the bankruptcy court might have been entitled to go in dealing with the inequity, on his reclamation petition.
The District Court [51 F.Supp. 1016] took the view that, regardless of what part Schapiro may have had in the withdrawal of the $99,900, the misconduct would in any event have been "entirely unrelated to the transaction in which he acquired the bonds" and so could not afford a basis for subordination of any part of his claim, because it was not connected with the "subject matter in litigation."[9] But, in dealing with creditors' claims in a bankruptcy proceeding, the "subject matter in litigation"  if it is at all necessary or desirable to use that term here  goes beyond the legal foundation and legal structure of the individual claim. For claim and distribution purposes, a bankruptcy proceeding is an integrated proceeding, and the "subject matter in litigation" in its practical aspect is the right of creditors to share in the bankruptcy assets themselves, not merely legally but in equitable relation to each other  for the assertion of a claim in bankruptcy *804 is, of course, not an attempt to recover a judgment against the debtor but to obtain a distributive share in the immediate assets of the proceeding. The inequity which will entitle a bankruptcy court to regulate the distribution to a creditor, by subordination or other equitable means, need not therefore be specifically related to the creditor's claim, either in its origin or in its acquisition, but it may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate; and with the most critical force may the application be made where a fiduciary relation is involved. Cf. Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, and see also Barlow v. Budge, 8 Cir., 127 F.2d 440, 446. Hence, it would seem that an improper use or appropriation of corporate assets by a fiduciary, which has occurred in reasonable proximity to the bankruptcy and while the corporation is insolvent, so that the bankruptcy results are directly affected by it, may constitute such an inequity against other creditors as to entitle the court to deal with it by appropriate and measured subordination of any claim asserted by the fiduciary against the estate, regardless of whether the appropriation is directly connected with the claim itself.[10]
In the present case, Schapiro received from Newman, within a few hours after the General Properties deal was closed, a check for $24,000 of the corporation's funds, which was part of the money he had just turned over in payment of the 500 new shares of stock that had been issued to Rosen as his agent. Newman had utterly no authority to make such a withdrawal in favor of Schapiro. Schapiro claimed that Newman had represented to him that the corporation had authorized the borrowing of the money by Newman and that he relied upon Newman's statement. The referee found, however, that Schapiro knew otherwise, and, on all the circumstances of the situation, this finding cannot be said to be clearly erroneous for any purposes to which it might be material in this proceeding, nor did the District Court hold that it was.
As to the $75,900 thereafter withdrawn by Newman, however, the record does not show that Schapiro ever received any part of it, and the referee did not purport so to find. The referee merely found that Schapiro had "notice" of Newman's misappropriation and that he "approved" of it. This finding appears to have rested primarily on Schapiro's admission on the stand that Newman had subsequently told him of the withdrawal and why it had been done, and that, on the basis of this explanation, he felt the withdrawal was justified. The natural import of this testimony would seem to be that Schapiro thought Newman was entitled to withdraw and hold the $75,900 until the difficulties which had arisen in the assignment of the International Paper account had been ironed out. In this, of course, he was legally mistaken, for the corporation and not Newman had become the legal owner or legal holder of the $100,000 at the time the General Properties deal was closed and the new stock was issued for it.
Schapiro's acceptance of the $24,000 from Newman in payment of Newman's alleged personal debt, when the corporation was insolvent, when he knew that Newman had no authority to use the funds for any such purpose, and while he was still the owner of the corporation's capital stock, would in our opinion constitute an inequity against general creditors in the bankruptcy situation, of which cognizance could properly be taken, in an appropriate manner, on any invocation by Schapiro of the equitable jurisdiction of the court in relation to its administration of the assets  such as the filing of a claim to share in the distribution of the estate.[11] As to the $75,- *805 900 later withdrawn by Newman, however, of which Schapiro had received no part, the wrong to general creditors lay in Newman's withdrawal and retention of the funds, and not in Schapiro's subsequent knowledge and mental sanction of what Newman had done. It does not appear that Schapiro ever ran the business of the corporation, but its affairs are shown to have been duly entrusted to officers and directors, of which Schapiro was neither, and there is nothing to indicate that he had in any way usurped or attempted to dominate the legal functions and responsibilities of the officers and directors. In this situation, the fact that he was the owner of the stock would not be sufficient to charge him with legal or equitable responsibility for the fraud committed by one of the officers and directors. Nor could his subsequent knowledge of or belief in the justification for such an act, which he had not caused and out of which he had received no enrichment, alone afford a basis for attempting to adjust his position on any claim asserted by him to the prejudice which had resulted to other creditors from the act. His legal claim position in the bankruptcy, as we have indicated, could be touched equitably only for his inequitable acts and not for his improper thoughts or beliefs.
The only inequity, therefore, to general creditors, which the bankruptcy court would have had any possible right to attempt to reach against Schapiro, was Schapiro's acceptance from Newman of the $24,000. We have said above that cognizance might properly be taken of that inequity, in an appropriate manner, on any invocation by Schapiro of the equitable jurisdiction of the court in relation to its administration of the assets  such as the filing of a claim to share in the distribution of the estate. But it should be noted that the attempt here was to reclaim property which was alleged to have no right or place in the estate, and that the situation therefore is not quite the same as an attempt to obtain a distributive share in the actual assets of the estate. The Supreme Court, in fact, has directly held that the filing of an ordinary reclamation petition is not of itself an invocation of or submission to the equitable jurisdiction of the bankruptcy court  where, we take it, it involves property to which the petitioner's title is absolute, and on which the bankrupt is without any legal hold, and as to which the bankruptcy court therefore can have no right of general administration. Daniel v. Guaranty Trust Co. of New York, 285 U.S. 154, 52 S.Ct. 326, 76 L.Ed. 675. It should be noted, however, that, in the more recent case of Pepper v. Litton, 308 U.S. 295, 308, footnote 18, 60 S.Ct. 238, 84 L.Ed. 281, the court cites illustratively, discusses, and may perhaps appear by implication to have approved the holding in National Cash Register Co. v. Dallen, 3 Cir., 76 F.2d 867, that, even in such a situation, the equitable powers of the court may be brought into play to the extent of imposing conditions upon the granting of the reclamation, in relation to any equities existing against the reclamation petitioner in the general bankruptcy situation. In the National Cash Register Co. case, the petitioner sought to reclaim a cash register which had been loaned to the bankrupt until delivery of a new machine which he had purchased. The bankrupt's old cash register had been turned in for a credit of $70 upon the new machine. Notwithstanding that the petitioner had absolute title to the loaned machine and seemingly clear legal right to possession as against the trustee, the Circuit Court of Appeals held that it was proper for the bankruptcy court to attach an equitable condition to the granting of the reclamation, requiring the petitioner to restore the old cash register to the estate or to pay over to the trustee its $70 credit value in cash. And it may be added that even in Daniel v. Guaranty Trust Co., supra, 285 U.S. at page 162, 52 S.Ct. at page 328, 76 L.Ed. 675, the court somewhat ambiguously remarked: "And the suggestion that it is possible to impose equitable terms as a condition to an order of reclamation is not helpful. No such conditional order was proposed or entered."
But whether the Supreme Court has intended to imply any recognition *806 of a right to consider equities against a reclamation petitioner, in relation to the bankruptcy situation generally, and to impose conditions with respect thereto upon the granting of the reclamation, where the petitioner has absolute title to the property and legal right to possession, may be doubtful, and we need not further consider the question here, for Schapiro was in any event not in the position of having an absolute reclamation right. His foreclosure had been instituted after the filing of the bankruptcy petition, without leave of the bankruptcy court, and his title to the foreclosed property was therefore not absolute against the estate,[12] but was dependent upon the recognition which might be given it by the bankruptcy court, as a matter of both legal and equitable consideration. See Isaacs v. Hobbs Tie & Timber Co., 282 U. S. 734, 51 S.Ct. 270, 75 L.Ed. 645; Bankruptcy Act § 70, sub. a, as amended, 11 U.S.C.A. § 110, sub. a. Schapiro's petition in fact asked for any necessary equitable relief.
The bankruptcy court might properly recognize the title and grant the reclamation, and so in legal effect confirm the foreclosure proceedings, if no interest of other creditors would soundly be served by refusing to do so. Cf. Heffron v. Western Loan & Bldg. Co., 9 Cir., 84 F.2d 301, 112 A.L.R. 501. If, however, there was some reason in the bankruptcy situation, in the interest of other creditors, why the title should not thus be recognized, the court clearly had the right to deny the reclamation and leave Schapiro to assert his lien claim against the property in the bankruptcy proceedings, within the full play of the court's general equitable powers. Or, if the situation could more fairly and practicably be handled by recognizing the foreclosure title and granting the reclamation but imposing equitable conditions thereon, the court equally had the power to deal with the situation in that manner, since Schapiro necessarily had to appeal to the court, both legally and equitably, for a recognition of his foreclosure title.
The referee, however, in refusing to recognize Schapiro's title under the foreclosure sale and in subordinating his lien rights, did not, as we have pointed out, do so for any purpose of equalizing the position of general creditors in relation to the loss of the $24,000 to the estate. The leveling off of the loss itself against Schapiro's lien claim was not at all within the purview of the subordination order. On the contrary, the referee chose to allow the trustee to deal with the loss of the $24,000 in separate proceedings, which he had a right to do in his power to supervise the methods of administering the estate. But having chosen not to level off in this proceeding the specific harm done to general creditors by the acceptance of the $24,000, the only purpose which the subordination order could serve, and the only purpose for which it was in fact made, was to forfeit the lien property to the general creditors in punishment of the inequity which the evidence justified the referee in finding that Schapiro had actually committed and the other inequities which the referee merely believed he had contemplated. The subordination order made for this purpose was manifestly erroneous, and the District Court  without regard to some of the reasons given for its action  was entitled to reverse it. And, since the attempt to accomplish such an unwarranted purpose was not a sound reason why the foreclosure sale should be set aside, the District Court's determination on the petition for review that the foreclosure sale should be recognized is entitled to stand, in view of the fact that it clearly appears that there is no excess or equity in the property for general creditors. The loss of the $24,000 will thus be allowed to be handled in separate proceedings, subject to the principles which control them, where the trustee, the referee and the District Court have chosen to leave it, as a method of administrative and legal handling.

IV.
One question raised by the trustee should perhaps previously have been mentioned. *807 The trustee contends that Schapiro's deed of trust was void as to personal property, (1) because it left the mortgagor with an absolute power of disposition; (2) because the provision as to after-acquired property was not sufficiently restrictive; and (3) because the description of the property generally was too indefinite.
As to the first contention, it is sufficient to say that the mortgagor was not left with an absolute power of disposition, as the trustee contends. On the contrary, the deed of trust expressly provided that none of the lien property could be disposed of by the mortgagor except with the consent of the indenture trustee. Cf. Thompson v. Foerstel, 10 Mo.App. 290, 296, and see concurring opinion in State, to Use of Kratzer v. Busch, 38 Mo.App. 440, 443, 444.
The provision as to after-acquired property would not seem to require consideration, for the reason, among others, that the printed record does not show that the property here involved is after-acquired.
As to the indefiniteness of the description generally, the referee and the District Court both recognized the validity of the deed of trust as to the property sought to be reclaimed  the District Court expressly and the referee in legal effect. The sufficiency of the instrument as to personal property not located in the newspaper plant, or as to property located therein but not used in or ordinarily incident to the publication of the paper, is not of present concern, for the property here involved is not of that character. We agree with the District Court that, as to the property sought to be reclaimed, the deed of trust is valid. The Missouri rule is that "a description of the chattels mortgaged is sufficient as constructive notice if a third person, with the aid of the description and by the inquiries which the instrument reasonably suggests, can identify the mortgaged property." Tobin v. Kampe, 8 Cir., 132 F. 2d 64, 65, 145 A.L.R. 366, and Missouri cases cited therein. We think any creditor reading the trust indenture would readily conclude that it at least covered the property in the newspaper plant that was used in or was incident to the publication of the newspaper and that he would have no difficulty on examination in identifying the property here involved as being of that character.

V.
Two other matters will merely be referred to in concluding.
The briefs engage in discussion on how far the District Court is required to accept the findings of the referee, under Order 47, General Orders in Bankruptcy, 11 U.S.C.A. following section 53, but most of this is only academic here.[13] The controlling facts in the present situation have been pointed out above and the right of either the referee or the District Court to deal with them has sufficiently been indicated.
The trustee has argued that the bonds ought in any event to be subordinated to the claims of general creditors, as the equivalent of a contribution by Doherty to capital, and that Schapiro's rights were properly subject to this equity because he took after maturity. The referee ignored this contention, but the District Court specifically held that it was without merit. At the time Doherty's secured loan was made, it manifestly was not intended as a contribution to general creditors, for there would then have been no occasion to set up the indenture trust. Nor is there anything in the subsequent situation, either in Doherty's treatment of his lien rights or in his dealings with the corporation or the other creditors, that compels the holding that the secured indebtedness must now *808 equitably be regarded as having been or as subsequently having become in effect a contribution to capital in favor of general creditors.[14]

VI.
We have indicated the purpose for which the referee would have been authorized to make subordination and the extent to which he could properly go in doing so. The subordination order made by the referee was neither within this purpose nor within this extent. The trustee seeks here to have us restore the subordination order which the referee made. The only matter in the situation which might have been the subject of any equitable adjustment in this proceeding, the referee and the trustee have chosen instead to have pursued by separate proceedings for direct legal recovery, and we are not asked to review the judgment here in relation to it. Under the circumstances the order of the District Court will be affirmed.
NOTES
[1] Newman withdrew $900 more of the funds a short time later and appropriated this also to his own use.
[2] The District Court did not expressly, but only impliedly, pass upon whether Schapiro was in any way a party to Newman's fraud, or whether he had received the $24,000 check from Newman, as he claimed, in payment of a personal obligation owing from Newman and without knowledge of Newman's fraud in using the corporation's check for this purpose. The findings merely declare that "Newman decamped with $99,900 of the working capital (an untoward event but not unexpected by Newman who had planned it)."
[3] The record suggests no possibility, and no one contends, that Schapiro ever could hope to receive a cent in dividends in the position to which he was subordinated by the referee.
[4] As to what constitutes unjust enrichment generally in fiduciary relation see Restatement, Restitution, ch. 12.
[5] We are not here concerned with the use of subordination in dealing with some breach of faith or other duty by a creditor toward the court itself, which is outside the present field.
[6] The orders for the restoration of the $24,000 and the $75,900 are involved in two separate appeals from the orders of the District Court made on petitions to review the referee's turnover orders. See Nos. 12,793, 144 F.2d 812, and 12,806, 144 F.2d 819, this date decided.
[7] Since the foreclosure-sale price is not shown by the record to be unfair, we must assume for present purposes that $250,000 is the fair value of the lien property.
[8] The court there said: "The transfer of the claims to Rosenow, and their allowance, in no wise altered the condition of the other creditors of the estate. How, then, can it be held that the mere fact that the assignee of the judgments intended to use them in some improper way affect his right to participate in the dividends of the estate, unless such fraudulent purpose was carried out to the injury of the other creditors?" The trustee's brief here, however, calls attention to a further statement in the opinion, 97 F. at page 770, in connection with another claim: "When a creditor by fraud will attempt to defeat the claims of other creditors, there is no hardship in postponing his demand, although a just one, to those which he has endeavored to defeat." But this statement must be read with the facts to which it was applied. The claim involved was one on a $37,000 judgment which the creditor had purchased for $2,000, under a collusive agreement with the judgment debtor that it would be used to protect him against his other creditors, and that the creditor's only interest therein should be the amount of his investment, and the balance of the judgment should belong to the judgment debtor. Through the issuance of an execution and a levy by the creditor, the judgment debtor was enabled as against his other creditors to continue the operation of his business for a time and to dispose of $4,500 worth of merchandise. On bankruptcy, the creditor filed a claim for the full amount of the judgment. The referee allowed the claim for the $2,000 which the creditor had invested in the judgment. The District Court held that any payments to the creditor should be postponed until the claims of the other creditors had been satisfied. The injury to other creditors in assisting the insolvent judgment debtor to continue his business and enabling him to dispose of $4,500 worth of merchandise, through the protection of the collusive execution-levy, clearly justified the subordination.
[9] The District Court appears also to have been of the opinion that, in order to entitle the court to make subordination of a fiduciary's claim, not only must the inequity have been directly related to the transaction in which he acquired his claim, but the transaction itself must have been one immediately between the bankrupt and the fiduciary. See 51 F. Supp. at pages 1014, 1015, 1021. It is clear, however, that, if an unjust enrichment affecting the bankruptcy results is involved, a bankruptcy court may take cognizance of the inequity in the fiduciary's position, without regard to whether his claim is based upon a transaction between himself and the bankrupt or upon a transaction between the bankrupt and the third party whose rights he has acquired, and even though the assertion of the claim by the third party himself would have been wholly equitable in the situation. Thus, for example, a bankruptcy court has on a number of occasions acted to prevent unjust enrichment by a fiduciary who has purchased claims from third parties at a discount, after bankruptcy or in anticipation of liquidation. See Monroe v. Scofield, 10 Cir., 135 F.2d 725, 728; In re Van Sweringen Co., 6 Cir., 119 F.2d 231, 234; In re Norcor Manufacturing Co., 7 Cir., 109 F.2d 407, 411; In re Los Angeles Lumber Products Co., D.C.S.D. Cal., 46 F.Supp. 77, 88, 89.
[10] Even as to voidable preferences received by a creditor, which are specifically dealt with in the statute, section 57, sub. g, of the Bankruptcy Act as amended, 11 U.S.C.A. § 93, sub. g, drastically provides that the claim of such a preferred creditor shall not be allowed unless the preference is surrendered. This applies not merely to a preference upon the immediate claim filed but to any other preference received by the creditor, at least upon a claim of the same class. See 6 Am.Jur., Bankruptcy, § 131.
[11] The provision of section 23, sub. b, of the Bankruptcy Act as amended, 11 U.S.C.A. § 46, sub. b, that "Suits by the receiver and the trustee shall be brought or prosecuted only in the courts where the bankrupt might have brought or prosecuted them if proceedings under this title had not been instituted, unless by consent of the defendant, except * * *," etc., does not prevent the adjustment of a creditor's claim position in relation to a general inequity on his part affecting the bankruptcy results, for the filing of a claim to share in the assets of the estate is a submission to the equitable jurisdiction of the bankruptcy court for purposes of achieving justness and fairness in asset distribution and liquidation results. Subordination does not involve any "recovery" against the claimant for the inequity which he has committed.
[12] Schapiro makes some attempt to argue that he had an absolute right to institute foreclosure after the filing of the bankruptcy petition, because of a defect in the petition in the necessary number of petitioning creditors. But, under section 18, sub. b, of the Bankruptcy Act, as amended in the Chandler Act, 11 U.S.C.A. § 41, sub. b, Schapiro had no right to attack the petition or to oppose the adjudication (see House Report No. 1409 on H.R. 8046, 75th Cong., 1st Sess. [1937] 17) and when the adjudication was made and became final, the sufficiency of the petition to permit the adjudication to relate back could not thus be collaterally attacked by him. See 2 Collier on Bankruptcy, 14th Ed., § 18.50; 1 Remington on Bankruptcy, 4th Ed., § 535.
[13] Schapiro's brief quotes from 8 Remington on Bankruptcy, 4th Ed., 1943 Supp., § 3796, as follows: "The eighth circuit apparently holds that its only duty on an appeal from a judge who has reversed a referee is to test whether the result which has been reached by the judge's exercise of his authorized functions is itself clearly erroneous" (citing Rait v. Federal Land Bank of St, Paul, 8 Cir., 135 F.2d 447). The Rait case merely holds that the District Court is entitled to set aside a finding of the referee which has been controlled by improper processes, as being clearly erroneous, under Order 47, General Orders in Bankruptcy, 11 U.S.C.A. following section 53, and that, where this has been done and the District Court has made a new finding, based on proper processes, the only duty of the Circuit Court of Appeals in such a situation is to test whether the finding thus made by the District Judge is itself clearly erroneous, under Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Cf. Rhodes v. Federal Land Bank of St. Paul, 8 Cir., 140 F.2d 612.
[14] The status of the unsecured advances which were later made by Doherty and by the two Cities Service subsidiaries, as contributions to capital, is not before us in this proceeding.